FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005 JAN 18 P 4: 10

U.S. DISTRICT COURT
DISTRICT OF MASS.

NO. 05-10104 NMG

---

XL SPECIALTY INSURANCE COMPANY,

Plaintiff,

-v-

ROBERT J. FABBRICATORE; KATHERINE
D. COURAGE; HENRY HERMANN; KEVIN
NEE; KEVIN J. MARONI; J. RICHARD
MURPHY; ROBERT NICHOLSON; MARK
E. NUNNELLY; CARL REDFIELD;
RICHARD J. SANTAGATI; RALPH C.
SILLARI; SCOTT M. SPERLING; and
RALPH S. TROUPE,

Defendants.

---

**FIRST AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT**

XL Specialty Insurance Company ("XL Specialty") brings this action for declaratory judgment pursuant to 28 U.S.C. § 1332 and 28 U.S.C. §§ 2201 and 2202 against current and former members of the board of directors and/or officers (the "Directors") of CTC Communications Group, Inc. ("CTC"). XL Specialty seeks a determination that the management liability and company reimbursement insurance policies issued to CTC by XL Specialty do not provide coverage for the claims asserted against the Directors in an adversary proceeding captioned *CTC Litigation Trust v. Fabbricatore et al.*, No. 04-55760-PBL (Bankr. D. Del.) ("the Underlying Action"), or that coverage is otherwise limited pursuant to applicable policy terms and conditions. In support of the Complaint, XL Specialty alleges as follows:

## NATURE OF ACTION

1.    This is an action by XL Specialty for a declaratory judgment concerning its rights and obligations under two policies of directors and officers liability insurance issued to CTC.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. §§ 2201 and 2202 as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a). A substantial part of the events giving rise to this dispute occurred in this district, the majority of the defendants reside in this district, and all defendants are subject to personal jurisdiction in this district. In addition, CTC is headquartered in Waltham, Massachusetts.

4.    This Court has personal jurisdiction over all defendants pursuant to Fed. R. Civ. P. 4(k) and Mass. Gen. Laws ch. 223A, § 3 as this action arises from, *inter alia*, each of the Directors' (1) transaction of business in Massachusetts, (2) allegedly causing tortious injury by an act or omission in Massachusetts, and/or (3) allegedly causing tortious injury in Massachusetts by an act or omission outside the commonwealth and the Directors regularly do business and engage in a persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered, in Massachusetts.

## PARTIES

5.    XL Specialty is a corporation engaged in the business of providing liability and property insurance. XL Specialty is organized and exists pursuant to the laws of the state of Delaware with its principal place of business in the state of Connecticut.

6.    On information and belief, Defendant Robert J. Fabbricatore is the founder and former CEO and Chairman of the Board for CTC. Defendant Fabbricatore is a citizen of Massachusetts with residences at 77 Barnard Avenue, Watertown, Massachusetts and 124 Hopewell Point Road, Wolfeboro, New Hampshire.

7.   On information and belief, Defendant Katherine D. Courage is a citizen of New York residing at 133 East 64th Street, Apartment 4B, New York, New York 10021.

8.   On information and belief, Defendant Henry Hermann is a citizen of Texas residing at 6425 Brookshire Drive, Dallas, Texas 75230.

9.   On information and belief, Defendant Kevin Nee is a citizen of Massachusetts residing at 9 Dunham Road, Lakeville, Massachusetts 02347.

10.   On information and belief, Defendant Kevin J. Maroni is a citizen of Massachusetts residing at 106 Laurel Road, Chestnut Hill, Massachusetts 02467-2212.

11.   On information and belief, Defendant J. Richard Murphy is a citizen of Massachusetts residing at 331 Beacon Street, #4, Boston, Massachusetts 02116.

12.   On information and belief, Defendant Robert Nicholson is a citizen of Massachusetts residing at 22 Hawthorne Road, Wellesley, MA 02481. Massachusetts.

13.   On information and belief, Defendant Mark E. Nunnelly is a citizen of Massachusetts residing at 49 Shaw Street, West Newton, Massachusetts 02465.

14.   On information and belief, Defendant Carl Redfield is a citizen of California residing at 170 West Tasman Drive, San Jose, California 95134.

15.   On information and belief, Defendant Richard J. Santagati is a citizen of Massachusetts residing at Three Farmland Circle, Andover, Massachusetts 01810.

16.   On information and belief, Defendant Ralph C. Sillari is a citizen of Massachusetts residing at 5 Solomon Pierce Road, Lexington, Massachusetts 02420.

17.   On information and belief, Defendant Scott M. Sperling is a citizen of Massachusetts residing at 4 Moore Road, Wayland, Massachusetts 01778.

18.    On information and belief, Defendant Ralph S. Troupe is a citizen of Massachusetts residing at 91 Nichols Road, Cohasset, Massachusetts 02025.

## FACTUAL ALLEGATIONS

### A.    The XL Specialty Policies

19.    Management Liability and Company Reimbursement Insurance Policy No. ELU 82780-01 ("the 2001-2003 Policy") was issued by XL Specialty to CTC for the period from October 19, 2001 to October 19, 2002 (attached hereto as Exhibit A). By endorsement, the policy period was extended to October 19, 2003. *See* Ex. A, Endorsement No. 3. The 2001-2003 Policy has a limit of liability of $10,000,000. It is a "claims-made" policy affording specified coverage, subject to all of the Policy's terms and conditions, to CTC's officers and directors for "Loss" resulting from a "Claim," as those terms are defined, first made during the Policy Period. *See id.*, Coverage Form at 1.

20.    Management Liability and Company Reimbursement Insurance Policy No. ELU 82780-02 ("the 2002-2009 Policy" and, collectively with the 2001-2003 Policy, "the Policies") was issued by XL Specialty to CTC for the period from October 19, 2002 to October 19, 2003 (attached hereto as Exhibit B). By endorsement, the policy period was extended to December 16, 2009. *See* Ex. B, Endorsement No. 11. The 2002-2009 Policy has a limit of liability of $10,000,000. It is also a "claims-made" policy affording specified coverage, subject to all of the Policy's terms and conditions, to CTC's officers and directors for "Loss" resulting from a "Claim," as those terms are defined, first made during the Policy Period. *See id.*, Coverage Form at 1.

21.    The 2001-2003 Policy excludes coverage for "Loss, including Defense Expenses, in connection with any Claim based upon, arising out of, directly or indirectly resulting from, in

4

consequence of, or in any way involving any Wrongful Act, Employment Practices Wrongful Act or Company Wrongful Act actually or allegedly occurring before: October 19, 2001." Ex. A., Endorsement No. 2.

22.     The 2002-2009 Policy provides that "no coverage will be available under this Policy for claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any act, error, omission, misstatement, misleading statement, neglect, breach of duty, Wrongful Act, Company Wrongful Act or Employment Wrongful Act committed or allegedly committed prior to October 19, 2002." Ex. B, Endorsement No. 2. (This provision and the provision quoted in paragraph 21 are herein referred to as "the Prior Acts Exclusions.")

23.     The 2001-2003 Policy further provides that XL Specialty will not be liable to make payment for Loss in connection with any Claim made "by, on behalf of, or at the direction of the Company, except and to the extent such Claim . . . is brought by the Bankruptcy Trustee or Examiner of the Company or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company." Ex. A., Coverage Form , Section III(G).

24.     The 2002-2009 Policy provides that XL Specialty will not be liable to make payment for Loss in connection with any Claim made "by, on behalf of, or in the name or right of, the Company or any Insured Person, except and to the extent such Claim . . . is brought by the Bankruptcy Trustee or Examiner of the Company or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company." Ex. B, Endorsement No. 6. (This provision and the provision quoted in paragraph 23 are herein referred to as "the Insured versus Insured Exclusions" or "the I.v.I. Exclusions.")

25.    The Policies both require "[a]s a condition precedent to any right to payment" under the Policies that "the Insured shall give written notice to the Insurer of any Claim as soon as practicable after it is first made." Policies, Section VI(A)(1). The Policies further provide that "[i]f, during the Policy Period, the Insured first becomes aware of a specific Wrongful Act" and the Insured (1) "provides the Insurer with written notice of the Specific Wrongful Act, . . . the consequences which have resulted or may result therefrom" and other enumerated particulars and (2) requests coverage for any subsequently resulting "Claim," then any such Claim "will be treated as if it had been first made during the Policy Period" that notice was provided. *Id.*, Section VI(A)(2).

26.    The Policies both exclude from coverage Loss in connection with any Claim "brought about or contributed to in fact by any: [¶] (1) intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or [¶] (2) profit or remuneration gained by any Insured to which such Insured is not legally entitled." Policies, Section III(F).

27.    The 2001-2003 Policy also contains the following definition of "Loss":

> "Loss" means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay. Loss will not include:
>
> (1)    the multiplied portion of any damage award;
>
> (2)    fines, penalties or taxes imposed by law; or
>
> (3)    matters which are uninsurable under the law pursuant to which this Policy is construed.

Ex. A, Section II(M).

28.    The 2002-2009 Policy contains the following definition of "Loss":

6

"Loss" means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay. Loss will not include:

(1)   the multiplied portion of any damage award;

(2)   fines, penalties or taxes imposed by law;

(3)   taxes or wages; or

(4)   matters which are uninsurable under the law pursuant to which this Policy is construed.

Ex. B, Endorsement No. 4.

29.    The Policies both define "Wrongful Act" in relevant part as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by any Insured Person while acting in his or her capacity as an . . . Insured Person of the Company or a person serving in a functionally equivalent role for the Parent Company or any Subsidiary." Policies, Section II(S).

**B.    The Underlying Action**

30.    CTC, a provider of telecommunications services in the Northeast and mid-Atlantic regions, filed for protection under Chapter 11 of the United States Bankruptcy Code on October 3, 2002 in the United States Bankruptcy Court for the District of Delaware.

31.    On information and belief, following the October 3, 2002 petition, CTC continued operations as a Debtor in Possession. At no time did the bankruptcy court appoint a trustee to administer the bankruptcy estate.

32.    The bankruptcy court confirmed CTC's Second Amended Joint Plan of Reorganization on November 20, 2003 ("the Plan"). On information and belief, the Plan created a Litigation Trust ("the Trust") to own and administer certain of CTC's assets for the benefit of CTC's creditors.

33.    Under the Plan, and a Litigation Trust Agreement implemented under the Plan, CTC agreed to assign and transfer all of its rights and interest in certain assets to the Litigation Trust. On information and belief, these assets include "Retained Actions," which the Plan defines to include all causes of action, either direct or derivative, against former or current officers or directors of CTC for actions taken or omitted to be taken prior to the filing of CTC's bankruptcy petition.

34.    On October 2, 2004, the Litigation Trust filed the Underlying Action as an adversary proceeding in the bankruptcy court. The Underlying Action names thirteen current or former officers and/or directors of CTC as defendants, seeking recovery of corporate funds directed to entities and individuals allegedly affiliated with CTC's former CEO and Chairman, Defendant Robert J. Fabbricatore, and certain other board members in a course of purported self-dealing conduct. The Underlying Action alleges that the Directors negligently permitted Fabbricatore "a virtual free reign to engage in a series of self-interested and unauthorized transactions."

35.    The Underlying Action states that the claims it sets forth are "Retained Actions" within the meaning of the Plan.

36.    The Underlying Action seeks damages for breach of fiduciary duty against both Fabbricatore and the Directors. It further alleges that Fabbricatore and the Directors continued to operate CTC "for at least two years after, upon information and belief, it became insolvent," during which time, *i.e.,* October 3, 2000 to October 3, 2002, "CTC suffered massive losses and . . . became more deeply insolvent, costing creditors substantial value." The Litigation Trust also seeks avoidance and recovery of transfers to Fabbricatore under the Bankruptcy Code and state

law dating back one or two years from the filing date of the bankruptcy petition on October 3, 2002.

37.    The Underlying Action alleges that Fabbricatore and certain other CTC insiders purportedly engaged in a course of self-dealing that facilitated and exacerbated CTC's insolvency. The Underlying Action contains the following relevant allegations:

(a)    Between 1998 and 2002, Fabbricatore allegedly directed that all work related to the build-out of CTC's proprietary PowerPath® Network be contracted out to an entity named Comm-Tract, which the Trust alleges was controlled by Fabbricatore. Underlying Action ¶¶ 29-33. Between October 3, 2000 and October 3, 2002, CTC allegedly paid Comm-Tract approximately $28 million. *Id.* ¶ 38. The Underlying Action also alleges that "CTC, at Fabbricatore's insistence, also paid a salary to Comm-Tract's President Polmonari between 1997 and 2002" even though "Polmonari did not provide any services whatsoever to CTC during this period." *Id.* ¶ 43.

(b)    In May 2000, Fabbricatore and certain other CTC insiders purportedly formed Telecom Realty LLC in order to purchase a building that CTC agreed to lease from Telecom Realty. *Id.* ¶¶ 46-50. The Trust alleges that the lease, which the board approved on May 22, 2000, "heavily and unfairly favored Telecom Realty at the expense of CTC," requiring CTC to substantially refurbish the building. *Id.* ¶¶ 53-54. During 2000 and 2001, expenditures by CTC relating to such activities purportedly totaled over $21.6 million. *Id.* ¶ 55.

(c)    The Trust alleges that Epiphany Ventures, a company allegedly formed by Fabbricatore, received sums from CTC for "significant costs and expenses . . . on account of [a] yacht that were unrelated to any usage by CTC or other CTC business purpose." *Id.* ¶¶ 60-61. Fabbricatore also allegedly used CTC aircraft and corporate apartments for his personal use. *Id.* ¶¶ 62-65. The Trust asserts that "the Directors were generally aware of Fabbricatore's pervasive misuse of various corporate assets," but they "failed to take reasonable steps to investigate or become knowledgeable in detail as to these abuses, and thus failed to act in a responsible manner to protect CTC." *Id.* ¶ 66.

(d)    The Trust alleges that in the spring of 2000, Fabbricatore arranged for margin loans from Paine Webber to himself and certain CTC officers and directors; such loans were secured with the officers' and directors' holdings of CTC common stock. *Id.* ¶ 67-68. According to the Trust, CTC's chief financial officer, at Fabbricatore's direction, made payments consisting of CTC corporate funds to Paine Webber in order to pay the margin loans when the value of the CTC stock declined in November 2000. *Id.* ¶¶ 70-72.

38.    On information and belief, the Litigation Trust effected service of the Underlying Action upon the Directors on or about December 7, 2004.

## CONTROVERSY AND RIPENESS

39.    The Directors have tendered the Underlying Action to XL Specialty and requested that XL Specialty provide coverage in connection with the Underlying Action, including the advancement of Defense Expenses.

40.    XL Specialty has identified the Prior Acts Exclusions and Insured versus Insured Exclusions as specific bars to coverage for the Underlying Action and has advised the Directors that coverage is precluded.

41.    XL Specialty has also advised the Directors that to the extent that there is any available coverage under the Policies (which XL Specialty disputes), other terms and conditions of the Policies restrict or eliminate coverage for portions of the Underlying Action, including but not limited to the following:

(a)    The Policies exclude from coverage Loss in connection with any Claim "brought about or contributed to in fact by any: [¶] (1) intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or [¶] (2) profit or remuneration gained by any Insured to which such Insured is not legally entitled." Policies, Section III(F).

(b)    The Policies' definitions of "Loss" and applicable law preclude coverage for the recovery of sums to which Fabbricatore and/or the Directors were not legally entitled and disallowance of certain proofs of claim filed by certain Directors in the bankruptcy proceeding sought in the Underlying Action.

(c)    The Trust's claim for sums alleged to constitute preferential transfers to Fabbricatore under the Bankruptcy Code do not constitute claims for "Wrongful Acts" as defined by the Policies.

42.    Upon information and belief, the defendants take issue with XL Specialty's coverage position.

10

43.    These coverage issues will directly govern XL Specialty's obligations, if any, under the Policies with respect to the pending Underlying Action. This matter is therefore ripe for adjudication.

## COUNT I

### DECLARATORY JUDGMENT THAT THE POLICIES' PRIOR ACTS EXCLUSIONS BAR COVERAGE

44.    XL Specialty incorporates by reference each of the allegations in paragraphs 1 through 43 of this Complaint.

45.    The 2001-2003 Policy excludes from coverage "Loss, including Defense Expenses, in connection with any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act, Employment Practices Wrongful Act or Company Wrongful Act actually or allegedly occurring before: October 19, 2001."

46.    The 2002-2009 Policy excludes from coverage "claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any act, error, omission, misstatement, misleading statement, neglect, breach of duty, Wrongful Act, Company Wrongful Act or Employment Wrongful Act committed or allegedly committed prior to October 19, 2002."

47.    The Underlying Action makes allegations "based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving" Wrongful Acts occurring prior to October 19, 2001. The Prior Acts Exclusion in the 2001-2003 Policy accordingly bars coverage for the Underlying Action.

48.    In addition, all of the conduct alleged in the Underlying Action occurred before CTC filed for bankruptcy protection on October 3, 2002. Thus, the Underlying Action makes

allegations "based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving" Wrongful Acts occurring prior to October 19, 2002. The Prior Acts Exclusion in the 2002-2009 Policy accordingly bars coverage for the Underlying Action.

49.    An actual and justiciable controversy exists between XL Specialty and the Directors with respect to the application of the Prior Acts Exclusions to the Underlying Action. Therefore, XL Specialty requests that the Court declare that coverage for the Underlying Action is barred by the Policies' Prior Acts Exclusions.

**COUNT II**

**DECLARATORY JUDGMENT THAT THE POLICIES'
INSURED VERSUS INSURED EXCLUSIONS BAR COVERAGE**

50.    XL Specialty incorporates by reference each of the allegations in paragraphs 1 through 49 of this Complaint.

51.    The 2001-2003 Policy provides that XL Specialty will not be liable to make payment for Loss in connection with any Claim made "by, on behalf of, at the direction of the Company, except and to the extent such Claim . . . is brought by the Bankruptcy Trustee or Examiner of the Company or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company."

52.    The 2002-2009 Policy provides that XL Specialty will not be liable to make payment for Loss in connection with any Claim made "by, on behalf of, or in the name or right of, the Company or any Insured Person, except and to the extent such Claim . . . is brought by the Bankruptcy Trustee or Examiner of the Company or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company."

53.    The Underlying Action is brought by a Litigation Trust created pursuant to the Plan under which CTC assigned its rights in the underlying claim to the Trust. The Trust asserts a claim that CTC voluntarily assigned to it under the plan of reorganization. The claim belonged to CTC as the Debtor in Possession and became the Trust's claim only upon the assignment. Accordingly, the Underlying Action is brought "by, on behalf of, or at the direction of the Company" or "in the name or right of" CTC within the meaning of the Policies' I.v.l. Exclusions.

54.    The Trust does not constitute a "Bankruptcy Trustee or Examiner of the Company or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company" within the meaning of the exception contained in the Policies' I.v.l. Exclusions.

55.    An actual and justiciable controversy exists between XL Specialty and the Directors with respect to the application of the Insured versus Insured Exclusions to the Underlying Action. Therefore, XL Specialty requests that the Court declare that coverage for the Underlying Action is barred by the Policies' Insured versus Insured Exclusions.

<u>**COUNT III**</u>

**DECLARATORY JUDGMENT REGARDING**
<u>**OTHER COVERAGE DEFENSES**</u>

56.    XL Specialty incorporates by reference each of the allegations in paragraphs 1 through 55 of this Complaint.

57.    Other terms and conditions of the Policies may ultimately be implicated even if the exclusions at issue in Counts I and II do not bar coverage for the Underlying Action. Such provisions include, but are not limited to the following:

(a)    Section III(F) of the Policies, which excludes from coverage Loss in connection with any Claim "brought about or contributed to in fact by any: [¶] (1) intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or [¶] (2) profit or remuneration gained by any Insured to which such Insured is not legally entitled";

(b)    the Policies' definitions of "Loss";

(c)    The Trust's claim for sums alleged to constitute preferential transfers to Fabbricatore under the Bankruptcy Code do not constitute claims for "Wrongful Acts" as defined by the Policies.

58.    Nothing in this Complaint should be construed as a waiver by XL Specialty of any other coverage defenses under the Policies, and XL Specialty reserves the right to raise all other terms and conditions of the Policies as defenses to coverage as appropriate.

59.    An actual and justiciable controversy exists between XL Specialty and the Directors with respect to the scope of XL Specialty's coverage obligations in connection with the Underlying Action. Therefore, in the event that the Court determines that the exclusions at issue in Counts I and II do not apply, XL Specialty requests that the Court declare that coverage is limited by applicable Policy provisions.

WHEREFORE, XL Specialty requests that the Court enter a declaration and judgment in its favor:

A.    Declaring that, for the reasons set forth in Count I, the Policies' Prior Acts Exclusions bar coverage for the Underlying Action;

B.    Declaring that, for the reasons set forth in Count II, the Policies' Insured versus Insured Exclusions bar coverage for the Underlying Action;

C.    Declaring, in the event that the Court determines that the exclusions at issue in Counts I and II do not apply, that, for the reasons set forth in Count III, XL Specialty's coverage obligations are limited by applicable Policy provisions;

14

D.    Awarding XL Specialty such additional declaratory and other relief as shall be found to be appropriate under the circumstances; and

E.    Awarding XL Specialty its fees and costs incurred in prosecuting this action.

Dated: January 18, 2005                          Respectfully submitted,

                                        **XL SPECIALTY INSURANCE COMPANY**

                                        By: _____

                                            Deborah L. Thaxter (BBO # 495520)
                                            Gregory P. Deschenes (BBO # 550830)
                                            Michael L. Cornell (BBO # 651405)
                                            NIXON PEABODY LLP
Of Counsel:                                 100 Summer Street
                                            Boston, MA  02110
    Daniel J. Standish                      (617) 345-1000 (phone)
    David H. Topol                          (617) 345-1300 (facsimile)
    Gary P. Seligman
    WILEY REIN & FIELDING LLP
    1776 K Street, NW
    Washington, DC 20006
    (202) 719-7000 (phone)
    (202) 719-7049 (facsimile)

Policy Number : **ELU 82780-01**

☐ G. enwich Insurance Company
☑ **XL Specialty Insurance Company**
**Members of the XL America Companies**

Renewal of Number

| MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT INSURANCE POLICY DECLARATIONS |
|---|

Executive Offices
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

**Item 1. Name and Mailing Address of Parent Company:**
CTC Communications Group, Inc.
220 Bear Hill Road
Waltham, MA 02451

**Item 2. Policy Period**: From: October 19, 2001      To: October 19, 2002
At 12:01 AM Standard Time at your Mailing Address Shown Above

**Item 3. Limit of Liability**:
$10,000,000 Aggregate each Policy Period (including **Defense Expenses**)

**Item 4. Retentions**:

| | |
|---|---|
| $0 | each **Insured Person** under INSURING AGREEMENT I (A) |
| $350,000 | each **Claim** under INSURING AGREEMENT I (B) |
| $350,000 | each **Claim** under INSURING AGREEMENT I (C) |

**Item 5. Optional Extension Period:**
Length of Optional Extension Period:
(Either one year or two years after the end of the **Policy Period**, at the election of the **Parent Company**)
Premium for Optional Extension Period:    One Year    $210,000    Two years $420,000

**Item 6. Pending and Prior Litigation Date**: October 19, 2001

**Item 7. Notices required to be given to the Insurer must be addressed to:**
Executive Liability Underwriters
One Constitution Plaza, 16th Floor
Hartford, CT 06103
Toll Free Telephone: 877-953-2636

**Item 8. Premium:**
Total Policy Premium    $210,000.00

**Item 9. Policy Form and Endorsements Attached at Issuance:**
DO 71 00 09 99    DO 72 35 11 01    DO 83 02 01 00

Countersigned: _____ By: _____
                              Date                                                    Authorized Representative

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

**In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations page, if required by law, by a duly authorized representative of the Insurer.**

**EXHIBIT A**

DO 70 00 11 01

MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT POLICY DECLARATIONS

Nicholas M. Brown Jr.
President

Theresa M. Morgan
Secretary

**XL Specialty Insurance Company**

Richard J. Callahan
President

Theresa M. Morgan
Secretary

**Greenwich Insurance Company**

DO 72 35 11 01

Endorsement No. 1
Named Insured: CTC Communications Group, Inc.
Policy No: ELU 82780-01

Effective: Ocotber 19, 2001
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# MASSACHUSETTS AMENDATORY ENDORSEMENT

Section VI., GENERAL CONDITIONS (E) CANCELLATION AND RENEWAL OF COVERAGE (2) is deleted and amended to read in its entirety as follows:

(2) The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than ten (10) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation shall be delivered to the **Parent Company**, or be left at its last address as shown on the Insurer's records or, if its records contain no such address, at its last address known to the Insurer, or be mailed to the address of the **Parent Company** by first class mail, postage prepaid. No written notice of cancellation shall be deemed effective when mailed by the Insurer unless the Insurer obtains a certificate of mailing receipt from the U.S. Postal Service showing the name and address of the **Parent Company** as stated in the Policy. The affidavit of any officer, agent or employee of the Insurer, duly authorized for that purpose, that such notice has been served shall be prima facie evidence that cancellation has been duly effected. If the Policy is made payable to a mortgagee or any person other than the **Parent Company**, notice must also be given to the mortgagee or other person in the manner provided above.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

DO 83 02 01 00

Endorsement No. 2

Named Insured: CTC Communications Group, Inc.

Policy No: ELU 82870-01

Effective: October 19, 2001

12:01 A.M. Standard Time

Insurer: XL Specialty Insurance Company

# PRIOR ACTS EXCLUSION

In consideration of the premium charged, the Insurer shall not pay Loss, including Defense Expenses, in connection with any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act, Employment Practices Wrongful Act or Company Wrongful Act actually or allegedly occurring before:

October 19, 2001.

All other terms, conditions and limitations of this Policy remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Endorsement No: 3
Named Insured: CTC Communications Group, Inc.
Policy No: ELU 82780-01

DO 90 09 06 01

Effective: October 19, 2002
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# CONVERT TO RUN-OFF ENDORSEMENT

In consideration of an additional premium of $210,000.00 charged:

(1)  Item 2 of the Declarations is amended to read in its entirety as follows:

"Item 2. Policy Period:   From: October 19, 2001 To: October 19, 2003
          At 12:01 AM Standard Time at your Mailing Address Shown Above"

(2)  It is expressly understood and agreed that the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations shall continue to be the maximum aggregate Limit of Liability for the entire Policy Period, as amended in paragraph (1) above.

(3)  Item 5 of the Declarations is deleted in its entirety.

(4)  Item 8 of the Declarations is amended to read in its entirety as follows:

"Item 8. Premium:
         Total Policy Premium 420,000.00"

(5)  No coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act, Employment Practices Wrongful Act or Company Wrongful Act committed or allegedly committed on or after October 19, 2002.

(6)  Section VI General Conditions (D)(5) of the Policy is deleted in its entirety.

(7)  Section VI General Conditions (E)(1) of the Policy is amended to read in its entirety as follows:

"(1)  Except for the nonpayment of premium, as set forth in (E)(2) below, the Parent Company has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice stating when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations."

(8)  Section VI General Conditions (F) of the Policy is deleted in its entirety. All other references in the Policy to the Optional Extension Period are deleted.

(9)  The entire premium for this Policy shall be deemed fully earned as of October 19, 2002.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

DO 90 09 06 01

Page 1 of 1

# MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT INSURANCE COVERAGE FORM

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to **Executive Liability Underwriters**, the Underwriting Manager for the **Insurer** identified in the Declarations (hereinafter the **Insurer**) including the Application and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the **Insurer**, the **Insured Persons** and the **Company** agree as follows:

## I.    INSURING AGREEMENTS

(A)    The **Insurer** shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act**, except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)    The **Insurer** shall pay on behalf of the **Company Loss** which the **Company** is required or permitted to pay as indemnification to any of the **Insured Persons** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act**.

(C)    The **Insurer** shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Company Wrongful Act**.

## II.    DEFINITIONS

(A)    "**Application**" means:

    (1)    the application attached to and forming part of this Policy; and

    (2)    any materials submitted therewith, which shall be retained on file by the **Insurer** and shall be deemed to be physically attached to this Policy.

(B)    "**Change In Control**" means:

    (1)    the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity;

    (2)    the acquisition by any person, entity or affiliated group of persons or entities of the right to vote, select or appoint more than fifty percent (50%) of the directors of the **Parent Company**; or

    (3)    the appointment of a Receiver, Conservator, Liquidator, Trustee,  Rehabilitator, or any comparable authority, with respect to the **Parent Company**.

(C)    "**Claim**" means:

    (1)    a written demand for monetary or non-monetary relief;

    (2)    any civil proceeding in a court of law or equity, or arbitration;

(3)    any criminal proceeding which is commenced by the return of an indictment; and

(4)    a formal civil, criminal, administrative regulatory proceeding or formal investigation of an **Insured Person** or the **Company** (but with respect to the **Company** only for a **Company Wrongful Act**) which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying in writing such **Insured Person** or the **Company** as a person or entity against whom a proceeding as described in (C)(2) or (3) above may be commenced, including any proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body having jurisdiction over any **Employment Practices Wrongful Act.**

(D)    **"Company"** means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to GENERAL CONDITIONS VI (D).

(E)    **"Company Wrongful Act"** means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the **Company** in connection with a **Securities Claim.**

(F)    **"Defense Expenses"** means reasonable legal fees and expenses incurred in the defense of any **Claim** including the premium for an appeal bond, attachment bond or similar bond but will not include applying for or furnishing such bond. **Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers or employees.

(G)    **"Employment Practices Wrongful Act"** means any actual or alleged:

(1)    wrongful termination of employment whether actual or constructive;

(2)    employment discrimination of any kind including violation of any federal, state or local law involving employment or discrimination in employment which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee, because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status;

(3)    sexual or other harassment in the workplace; or

(4)    wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, or refusal to hire.

(H)    **"Employment Practices Claim"** means a **Claim** alleging an **Employment Practices Wrongful Act.**

(I)    **"Insured"** means the **Insured Persons** and the **Company.**

(J)    **"Insured Person"** means:

(1)    any past, present or future director or officer, or member of the Board of Managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

(2)    any past, present or future employee of the **Company** to the extent any **Claim** is a **Securities Claim;**

(3)    an individual identified in (J)(1) above who, at the specific written request of the **Company**, is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity;**

(4)    any individual identified in (J)(1) above who, at the specific written request of the **Company** is serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture;** or

DO 71 00 09 99

(5)     the lawful spouse of any person set forth in the above provisions of this definition, but only to the extent the spouse is a party to any **Claim** solely in their capacity as a spouse of such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and spouse, or property transferred from any such person to the spouse.

In the event of the death, incapacity or bankruptcy of an individual identified in (J)(1), (2), (3), (4) or (5) above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** or **Employment Practices Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

(K)     "**Interrelated Wrongful Acts**" means any **Wrongful Act, Company Wrongful Act, or Employment Practices Wrongful Act** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events.

(L)     "**Joint Venture**" means any corporation, partnership, joint venture, association or other entity, other than a **Subsidiary**, during any time in which the **Parent Company**, either directly or through one or more **Subsidiary(s)**;

(1)     owns or controls at least thirty three percent (33%), but not more than fifty percent (50%), in the aggregate of the outstanding securities or other interests representing the right to vote for the election or appointment of those persons of such an entity occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

(2)     has the right, by contract, ownership of securities or otherwise, to elect, appoint or designate at least thirty three (33%) of those persons described in (L)(1) above.

(M)     "**Loss**" means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and **Defense Expenses** in excess of the Retention that the **Insured** is legally obligated to pay. **Loss** will not include:

(1)     the multiplied portion of any damage award;

(2)     fines, penalties or taxes imposed by law; or

(3)     matters which are uninsurable under the law pursuant to which this **Policy** is construed.

**NOTE:** With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the **Insured**, punitive damages are insurable under applicable law the Insurer will not dispute the written opinion of counsel for the **Insured**.

(N)     "**Non-Profit Entity**" means a corporation or organization other than the **Company**, which is exempt from taxation under Section 501(c)(3), (4) and (10) of the Internal Revenue Code as amended or any rule or regulation promulgated thereunder.

(O)     "**Parent Company**" means the entity named in ITEM 1 of the Declarations.

(P)     "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

(Q)    **"Securities Claim"** means a **Claim** made against an **Insured** for:

    (1)    any actual or alleged violation of the Securities Act of 1933 as amended, the Securities Exchange Act of 1934 as amended, any similar federal or state statute or any rules or regulations promulgated thereunder; or

    (2)    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty arising from or in connection with the purchase or sale of, or offer to purchase or sell any securities issued by the **Company**, whether such purchase, sale or offer involves a transaction with the **Company** or occurs in the open market.

(R)    **"Subsidiary"** means any entity during any time in which the **Parent Company** owns, directly or through one or more **Subsidiary(s)**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

(S)    **"Wrongful Act"** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by any **Insured Person** while acting in his or her capacity as an:

    (1)    **Insured Person** of the **Company** or a person serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary;**

    (2)    **Insured Person** of the **Company** who at the specific written request of the **Company** is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity;** or

    (3)    **Insured Person** of the **Company**, who at the specific written request of the **Company** is serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture.**

## III.    EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured Person**, or with respect to INSURING AGREEMENT (C), the **Company:**

(A)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this EXCLUSION (A) will not apply to any allegations of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of an **Employment Practices Claim** for an **Employment Practices Wrongful Act;**

(B)    for any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste. With respect to a **Claim** made under INSURING AGREEMENT (A) only, this EXCLUSION (B) will not apply to a **Claim** unless a court of competent jurisdiction specifically determines the **Company** is not permitted to indemnify the **Insured Person;**

    **NOTE:** EXCLUSIONS (A) and (B) above will not apply with respect to a **Securities Claim** brought by a security holder of the **Company**, or a derivative action brought by or on behalf of, or in the name or right of, the **Company**, and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, an **Insured**.

(C)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation;

(D)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to the Pending and Prior Litigation Date set forth in ITEM 6 of the Declarations;

(E)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

(F)    brought about or contributed to in fact by any:

(1)    intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

(2)    profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

as determined by a final adjudication in the underlying action or in a separate action or proceeding;

(G)    by, on behalf of, or at the direction of the **Company**, except and to the extent such **Claim**:

(1)    is brought derivatively by a security holder of the **Company** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of an **Insured Person** or the **Company**; or

(2)    is brought by the Bankruptcy Trustee or Examiner of the **Company** or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company**;

(H)    by, on behalf of, at the direction of or in the name or right of any **Non-Profit Entity** or **Joint Venture** against an **Insured Person** for a **Wrongful Act** or **Employment Practices Wrongful Act** while acting in his or her capacity as a director, officer, trustee, regent or governor of such, or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated; or

(I)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an **Insured Person** acting in their capacity as a **Insured Person** of any entity other than the **Company, Non-Profit Entity** or **Joint Venture.**

No conduct of any **Insured Person** will be imputed to any other **Insured** to determine the application of any of the above EXCLUSIONS.

## IV.    LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS

(A)    The Insurer shall pay the amount of **Loss** in excess of the applicable Retention(s) set forth in ITEM 4 of the Declarations up to the Limit of Liability set forth in ITEM 3 of the Declarations.

(B)    The amount set forth in ITEM 3 of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy. Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(C) With respect to the **Company's** indemnification of its **Insured Persons**, the certificate of incorporation, charter, by-laws, articles of association, or other organizational documents of the **Parent Company**, each **Subsidiary** and each **Non-Profit Entity** or **Joint Venture**, will be deemed to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

(D) The Retention applicable to INSURING AGREEMENT (B) shall apply to any **Loss** as to which indemnification by the **Company, Non-Profit Entity** or **Joint Venture** is legally permissible, whether or not actual indemnification is made unless such indemnification is not made by the **Company, Non-Profit Entity** or **Joint Venture** solely by reason of its financial insolvency. In the event of financial insolvency, the Retention(s) applicable to INSURING AGREEMENT (A) shall apply.

(E) If different retentions are applicable to different parts of any **Loss**, the applicable Retention(s) will be applied separately to each part of such **Loss**, and the sum of such Retention(s) will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

(F) Notwithstanding the foregoing, solely with respect to a **Securities Claim**, no Retention shall apply to such **Claim** and the Insurer will reimburse those **Defense Expenses** incurred by the **Insured** if:

(1) the **Securities Claim** is dismissed, or there is a stipulation to dismiss the **Securities Claim**, with or without prejudice and without the payment of any monetary consideration by the **Insured**;

(2) there is a final judgment of no liability obtained prior to or during trial, in favor of the **Insured**, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or

(3) there is a final judgment of no liability obtained after trial, in favor of the **Insured**, after the exhaustion of all appeals.

Any reimbursement in the case of (F)(1), (2), or (3) above will only occur if ninety (90) days after the date of dismissal, stipulation, final judgment of no liability is obtained and only if:

(a) the same **Securities Claim** (or a **Securities Claim** containing **Interrelated Wrongful Acts**) is not brought again within that time; and

(b) the **Insured** provides the Insurer with an Undertaking in a form acceptable to the Insurer that such reimbursement of the applicable Retention(s) will be paid back to the Insurer in the event the **Securities Claim** (or a **Securities Claim** containing **Interrelated Wrongful Acts**) is brought after the ninety (90) day period.

## V. DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS

(A) It shall be the duty of the **Insured** and not the duty of the Insurer to defend any **Claim** under this Policy.

(B) No **Insured** may incur any **Defense Expenses** or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably withheld.

(C) Upon the written request of an **Insured**, the Insurer will advance **Defense Expenses** on a current basis in excess of the applicable Retention, if any, before the disposition of the **Claim** for which this policy provides coverage. As a condition of the advancement of **Defense Expenses**, the Insurer may require a written undertaking, in a form satisfactory to the Insurer, which will guarantee the repayment of any **Loss** including **Defense Expenses** paid to or on behalf of the **Insured** if it is finally determined that the **Loss** incurred is not covered under this Policy.

(D) If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insured** contains both covered and uncovered matters, or because a **Claim** is made against both the **Insured** and others (including the **Company** for **Claims** other than **Securities Claims**) not insured

under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of **Loss** that is not covered under this Policy. Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by, the **Insured** and others.

(E)    In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in (D) above, then the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.    GENERAL CONDITIONS

### (A)    NOTICE

(1)    As a condition precedent to any right to payment under this Policy with respect to any **Claim**, the **Insured** shall give written notice to the Insurer of any **Claim** as soon as practicable after it is first made.

(2)    If, during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** and if, during the **Policy Period**, the **Insured**:

(a)    provides the Insurer with written notice of the specific **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, the circumstances by which the **Insured** first became aware of such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**; and

(b)    requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**;

then any **Claim** subsequently made arising out of such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** will be treated as if it had been first made during the **Policy Period**.

(3)    All notices under GENERAL CONDITIONS (A)(1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 7 of the Declarations; Attention: Claim Department.

### (B)    INTERRELATED CLAIMS

All **Claims** arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the time at which the earliest such **Claim** is made or deemed to have been made pursuant to GENERAL CONDITIONS (A)(1) above or GENERAL CONDITIONS (A)(2), if applicable.

### (C)    OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES

(1)    All **Loss** payable under this Policy will be specifically excess of and will not contribute with any other insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy. This Policy will not be subject to the terms of any other insurance policy.

(2)    All coverage under this Policy for **Loss** from **Claims** made against the **Insured Persons** while acting in their capacity as a director, officer, trustee, regent or governor of a **Non-Profit Entity** or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the **Insured Persons** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture** will be specifically excess of and will not contribute with, any other insurance or indemnification available to such **Insured Person** from such **Non-Profit Entity** or **Joint Venture** by reason of their service as such.

(D)    **MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)**

(1)    If during the **Policy Period**, the **Company** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage shall be provided for any **Loss** involving a **Claim** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** occurring after the consummation of the transaction.

(2)    If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the entity, assets, **Subsidiary** or liabilities so acquired or so assumed, exceed thirty five percent (35%) of the total assets or liabilities of the **Company**, as represented in the **Company's** most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days for any **Loss** involving a **Claim** for a **Wrongful Act**, **Company Wrongful Act**, or **Employment Practices Wrongful Act** that occurred after the transaction has been consummated. Coverage beyond the ninety (90) day period will be provided only if:

    (a)    the Insurer receives written notice containing full details of the transaction(s); and

    (b)    the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

(3)    With respect to the acquisition, assumption, merger, consolidation or otherwise of any entity, asset, **Subsidiary** or liability as described in (D)(1) and (2) above, there will be no coverage available under this Policy for **Claims** made against the acquired, assumed, merged, or consolidated entity, asset, **Subsidiary**, liability, or **Insured Person** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** committed any time during which such entity, asset, liability or **Subsidiary** is not an **Insured**.

(4)    If during the **Policy Period** any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who, because of their service with such **Subsidiary**, were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

(5)'    If, during the **Policy Period**, there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** against an **Insured** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** committed or allegedly committed up to the time of the **Change In Control**; and

    (a)    coverage will cease with respect to any **Claim** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** committed subsequent to the **Change In Control**; and

    (b)    the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control**.

under this Policy, the **Insured** and the **Insurer** will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of **Loss** that is not covered under this Policy. Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by, the **Insured** and others.

(E)    In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in (D) above, then the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.    GENERAL CONDITIONS

### (A)    NOTICE

(1)    As a condition precedent to any right to payment under this Policy with respect to any **Claim**, the **Insured** shall give written notice to the Insurer of any **Claim** as soon as practicable after it is first made.

(2)    If, during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act, Company Wrongful Act** or Employment Practices **Wrongful Act** and if, during the **Policy Period**, the **Insured**:

    (a)    provides the Insurer with written notice of the specific **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, the circumstances by which the **Insured** first became aware of such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**; and

    (b)    requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**;

then any **Claim** subsequently made arising out of such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** will be treated as if it had been first made during the **Policy Period**.

(3)    All notices under GENERAL CONDITIONS (A)(1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 7 of the Declarations; Attention: Claim Department.

### (B)    INTERRELATED CLAIMS

All **Claims** arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the time at which the earliest such **Claim** is made or deemed to have been made pursuant to GENERAL CONDITIONS (A)(1) above or GENERAL CONDITIONS (A)(2), if applicable.

### (C)    OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES

(1)    All **Loss** payable under this Policy will be specifically excess of and will not contribute with any other insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy. This Policy will not be subject to the terms of any other insurance policy.

**(H)   EXHAUSTION**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss,** the premium as set forth in ITEM 8 of the Declarations will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

**(I)   REPRESENTATION CLAUSE**

The **Insured** represents that the statements and particulars contained in the **Application** as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are material to the risk assumed and form the basis of this Policy. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person(s) who signed the **Application**. In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

**(J)   ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

    (1)   No action may be taken against the Insurer unless, as a condition precedent thereto:

        (a)   there has been full compliance with all of the terms and conditions of this Policy; and

        (b)   the amount of the obligation of the **Insured** has been finally determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured,** the claimant and the Insurer.

    (2)   Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the Insurer to determine their liability, nor may the **Insured** implead the Insurer in any **Claim.**

    (3)   Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

    (4)   Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations may only be waived or changed by written endorsement.

**(K)   AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect to:

    (1)   the payment of the premiums;

    (2)   the receiving of any return premiums that may become due under this Policy;

    (3)   the giving of all notices to the Insurer as provided herein; and

    (4)   the receiving of all notices from the Insurer.

(L)    ENTIRE AGREEMENT

The **Insured** agrees that the Declarations, Policy, including the endorsements, attachments and the **Application** shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.

## EXECUTIVE LIABILITY UNDERWRITERS

---

### RENEWAL APPLICATION FOR MANAGEMENT LIABILITY INSURANCE
### INCLUDING COMPANY REIMBURSEMENT

---

**NOTICE: THE POLICY FOR WHICH THIS RENEWAL APPLICATION IS MADE APPLIES, SUBJECT TO ITS TERMS, ONLY TO "CLAIMS" FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED BY "DEFENSE EXPENSES," AND "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION. THE INSURER WILL HAVE NO DUTY UNDER THE POLICY TO DEFEND ANY "CLAIM." THE ENTIRE APPLICATION SHOULD BE CAREFULLY READ BEFORE IT IS EXECUTED.**

1.
   a) Name of Applicant: _CTC COMMUNICATIONS GROUP INC. + SUBSIDIARIES_
   (Whenever used in this Application, the term "Applicant" shall mean the Parent Company)

   b) Principal Address: _220 BEAR HILL RD_
   City: _WALTHAM_ State: _MA_ Zip Code: _02451_

   c) Name and title of the officer of the **Applicant** designated as the representative to receive all notices from the Insurer on behalf of all person(s) and entity(s) proposed for this Insurance:
   _JOHN D. PITTENGER, E.V.P. FINANCE_

2. Has the **Applicant** or any **Subsidiary** in the past twelve (12) months completed or agreed to, or does it contemplate within the next (12) months, any of the following, whether or not such transaction was or will be completed? If "Yes," please describe the significant provisions of the transaction(s) as an attachment to this Application.

   _SEE ATTACHMENT_

   a) Sale, distribution or divestiture of any assets or stock other than in the ordinary course of business in an amount exceeding 25% of the Applicant's consolidated assets? ☐ Yes ☐ No

   b) Any registration for a public or private placement of securities? ☐ Yes ☐ No

   c) Merger, acquisition or consolidation with another entity whose consolidated assets exceed 25% of the Applicant's consolidated assets? ☐ Yes ☐ No

   d) Reorganization or arrangement with creditors under federal or state law? ☐ Yes ☐ No

3. Have the outside auditors stated there are no material weaknesses in the **Applicant's** system of internal controls?
   If "No", please provide the latest CPA letter to management and management's response ☒ Yes ☐ No

4. As part of this Application, please submit the following documents with respect to the Applicant:

   ✓ a) Latest 10-Q report filed and any 8-K or 13D reports filed with the SEC within the last 12 months.

   b) Each prospectus, offering circular or private placement memorandum within the last 12 months.

   ✓ c) Last proxy statement, 10-K and annual report, including audited financial statements with all notes and schedules.

   d) If amended since last submitted, copies of all provisions of the Applicant's charter and bylaws relating to the indemnification of its directors and officers. _SEE ATTACHMENT_

5. As part of this Application, please submit a schedule of all material litigation or administrative proceedings with a brief description of each case or proceeding commenced. _NONE_

THE UNDERSIGNED AUTHORIZED AGENT OF THE PERSON(S) AND ENTITY(S) PROPOSED FOR THIS INSURANCE, FOR THE PURPOSE OF THIS RENEWAL APPLICATION, DECLARE THAT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, AFTER REASONABLE INQUIRY, THE STATEMENTS HEREIN ARE TRUE AND COMPLETE. THE INSURER IS AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION. SIGNING THIS RENEWAL APPLICATION DOES NOT BIND THE INSURER TO COMPLETE THE INSURANCE. IT IS AGREED AND UNDERSTOOD THAT THIS RENEWAL APPLICATION SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND WILL BE ATTACHED THERETO.

SUBMISSION OF THIS RENEWAL APPLICATION DOES NOT BIND THE INSURER TO ISSUE ANY COVERAGE; HOWEVER, IT IS AGREED THAT THIS RENEWAL APPLICATION AND ANY MATERIALS SUBMITTED HEREWITH, TOGETHER WITH ALL APPLICATIONS FOR ANY POLICIES ISSUED BY THE INSURER FOR WHICH THIS POLICY IS INTENDED TO BE A RENEWAL OR REPLACEMENT, ARE THE BASIS FOR ISSUANCE OF ANY POLICY WHICH MAY BE ISSUED TO THE APPLICANT BY THE INSURER PURSUANT TO THIS RENEWAL APPLICATION.

**DO 95 01 09 99** **Page 1 of 3**

# EXECUTIVE LIABILITY UNDERWRITERS

IT IS AGREED THAT IN THE EVENT THERE IS ANY MATERIAL CHANGE IN THE ANSWERS TO THE QUESTIONS CONTAINED HEREIN BETWEEN THE DATE OF THIS RENEWAL APPLICATION AND THE POLICY AND THE POLICY EFFECTIVE DATE, THE APPLICANT WILL NOTIFY THE INSURER AND, AT THE SOLE DISCRETION OF THE INSURER,  ANY OUTSTANDING QUOTATIONS MAY BE MODIFIED OR WITHDRAWN.

THE UNDERSIGNED DECLARES THAT THE PERSON(S) AND ENTITY(S) PROPOSED FOR THIS INSURANCE UNDERSTAND:

(A)     THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE COMPLETELY EXHAUSTED BY THE PAYMENT OF "DEFENSE EXPENSES," AND IN SUCH EVENT, THE INSURER WILL NOT BE RESPONSIBLE FOR ANY ONGOING DEFENSE EXPENSES OR FOR THE AMOUNT OF ANY JUDGEMENT OR SETTLEMENT TO THE EXTENT THAT ANY OF THE FOREGOING EXCEED ANY APPLICABLE LIMIT OF LIABILITY;

(B)     "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION;

(C)     THIS POLICY APPLIES ONLY TO "CLAIMS" FIRST MADE OR DEEMED MADE DURING THE "POLICY PERIOD," OR, IF PURCHASED, ANY EXTENDED REPORTING PERIOD;

(D)     THE INSURER HAS NO DUTY UNDER THIS POLICY TO DEFEND ANY "CLAIM."

IF THE INFORMATION IN THIS APPLICATION MATERIALLY CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE POLICY EFFECTIVE DATE, THE APPLICANT WILL NOTIFY THE INSURER WHO MAY MODIFY OR WITHDRAW ANY QUOTATION.

THE INFORMATION CONTAINED AND SUBMITTED WITH THIS APPLICATION IS ON FILE WITH THE INSURER AND, ALONG WITH THE APPLICATION, IS CONSIDERED TO BE PHYSICALLY ATTACHED TO THE POLICY AND WILL BECOME PART OF THE POLICY IF ISSUED.

NOTICE TO COLORADO APPLICANTS: IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY.  PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

NOTICE TO FLORIDA APPLICANTS: ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY EMPLOYER OR EMPLOYEE, INSURANCE COMPANY, OR SELF-INSURED PROGRAM, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE OR MISLEADING INFORMATION IS GUILTY OF A THIRD DEGREE FELONY.

NOTICE TO KENTUCKY APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES ANY APPLICATION FOR INSURANCE CONTAINING ANY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

NOTICE TO MINNESOTA, OHIO AND ARKANSAS APPLICANTS:  ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD, WHICH IS A CRIME.

NOTICE TO NEW JERSEY APPLICANTS: ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION. NO COVERAGE EXISTS FOR CLAIMS FIRST MADE AFTER THE END OF THE POLICY PERIOD UNLESS, AND TO THE EXTENT, THE EXTENDED REPORTING PERIOD APPLIES. UPON TERMINATION OF COVERAGE FOR ANY REASON, A 60-DAY AUTOMATIC EXTENDED REPORTING PERIOD WILL APPLY. FOR AN ADDITIONAL PREMIUM CALCULATED AS INDICATED IN ITEM 5 OF THE DECLARATION, AN EXTENDED REPORTING PERIOD CAN BE PURCHASED FOR A PERIOD OF AT LEAST ONE YEAR. NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE EXTENDED REPORTING PERIOD WHICH MAY RESULT IN A POTENTIAL COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT SUBSEQUENTLY PROVIDED BY ANOTHER CARRIER. DURING THE FIRST SEVERAL YEARS OF CLAIMS MADE RELATIONSHIPS, CLAIMS MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED CAN EXPECT SUNSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE INCREASES UNTIL THE CLAIMS MADE RELATIONSHIP REACHES MATURITY.

# EXECUTIVE LIABILITY UNDERWRITERS

NOTICE TO OKLAHOMA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

NOTICE TO PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

_CTC COMMUNICATIONS GROUP, INC. + SUBSIDIARIES_
APPLICANT:

BY (Signature of Chairman and/or President)          TITLE          DATE

It is agreed and understood that the Application will only be executed by the Chairman and/or President of the Applicant acting in their capacity(s) as the authorized agent of the individual(s) and entity(s) proposed for this insurance.

PRODUCER (Insurance Agent or Broker):          INSURANCE AGENCY OR BROKERAGE:

INSURANCE AGENCY OR BROKERAGE TAXPAYER ID          AGENT OR BROKER LICENSE NO.:
OR SOCIAL SECURITY NO.:

ADDRESS OF AGENT OR BROKER (include Street, City, and Zip Code):

E-MAIL ADDRESS OF AGENT OR BROKER:

SUBMITTED BY (Insurance Agency or Brokerage):

INSURANCE AGENCY OR BROKERAGE TAXPAYER ID          AGENT OR BROKER LICENSE NO.:
OR SOCIAL SECURITY NO.:

ADDRESS OF AGENT OR BROKER (include Street, City, and Zip Code):

## CTC COMMUNICATIONS GROUP, INC.

ATTACHMENT RE: QUESTION 2

The Company and its operating subsidiaries are engaged in restructuring their businesses and operations. The restructuring may include a sale or disposition of assets, and/or a merger or consolidation with another entity. In addition, the restructuring plan may also include a filing under Chapter 11 of the Federal Bankruptcy Laws. It is not presently contemplated that any proposed transaction will require the filing by the Company of a registration statement under the Securities Act of 1933, as amended. To date, the Company has not entered into any agreements in connection with any such proposed restructuring transaction."

*CTC COMMUNICATIONS GROUP INC.*

*ATTACHMENT RE: QUESTION 4D. (NO CHANGE IN PROVISIONS)*

## Indemnification of Directors and Officers.

Article Sixth of the Restated Certificate of Incorporation of CTC Communications Group, Inc. ("CTC") provides with respect to the indemnification of directors and officers that CTC shall indemnify to the fullest extent permitted by Sections 102(b)(7) and 145 of the Delaware General Corporation Law, as amended from time to time, each person that such Sections grant CTC the power to indemnify. Article Seventh of the Certificate of Incorporation of CTC also provides that no director shall be liable to the corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except with respect to (1) a breach of the director's duty of loyalty to the corporation or its stockholders, (2) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (3) liability under Section 174 of the Delaware General Corporation Law or (4) a transaction from which the director derived an improper personal benefit, it being the intention of the foregoing provision to eliminate the liability of the corporation's directors to the corporation or its stockholders to the fullest extent permitted by Section 102(b)(7) of the Delaware General Corporation Law, as amended from time to time.

Article IV of the bylaws of CTC provides for the indemnification of directors and officers of CTC, as well as others serving at CTC's request in such capacity for another entity, against all expenses and liabilities reasonably incurred while serving in such capacity; except that no indemnification may be afforded in instances where the individual is adjudged not to have acted in good faith in the reasonable belief that such action was in the best interests of CTC.

Indemnification may be afforded in connection with the settlement of an action but only in accordance with a Board resolution and if CTC has received an opinion of counsel that such settlement is in the best interest of CTC and that such individual appears to have acted in good faith in the reasonable belief that his action was in the best interests of CTC.

Exhibit B

Policy Number: **ELU 82780-02**

Renewal of Number

☐   Greenwich Insurance Company
☑   **XL Specialty Insurance Company**
Members of the XL America Companies

---

| MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT INSURANCE POLICY DECLARATIONS |
|---|

Executive Offices
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

---

**Item 1. Name and Mailing Address of Parent Company:**
CTC Communications Group, Inc.
220 Bear Hill Road
Waltham, MA 02451

---

**Item 2. Policy Period:** From: October 19, 2002    To: October 19, 2003
At 12:01AM Standard Time at your Mailing Address Shown Above

---

**Item 3. Limit of Liability:**
$10,000,000    Aggregate each Policy Period (including **Defense Expenses**)

---

**Item 4. Retentions:**

| | |
|---|---|
| $0 | each **Insured Person** under INSURING AGREEMENT I (A) |
| $350,000 | each **Claim** under INSURING AGREEMENT I (B) |
| $350,000 | each **Claim** under INSURING AGREEMENT I (C) |

---

**Item 5. Optional Extension Period:**
Length of Optional Extension Period:
(Either one year or two years after the end of the **Policy Period**, at the election of the **Parent Company**)
Premium for Optional Extension Period:    One Year    $490,000    Two Years    N/A

---

**Item 6. Pending and Prior Litigation Date:** October 19, 2001

---

**Item 7. Notices required to be given to the Insurer must be addressed to:**
Executive Liability Underwriters
One Constitution Plaza, 16th Floor
Hartford, CT 06103
Toll Free Telephone: 877-953-2636

---

**Item 8. Premium:**
Taxes, Surcharges or Fees    $
Total Policy Premium    $245,000.00

---

**Item 9. Policy Form and Endorsements Attached at Issuance:**
DO 71 00 09 99    DO 72 35 11 01    DO 83 59 09 02    DO 80 176 06 02    DO 80 177 06 02    DO 80 142 10 01
DO 83 27 07 01

---

Countersigned: _____    By: _____
Date                                          Authorized Representative

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

**In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations page, if required by law, by a duly authorized representative of the Insurer.**

DO 70 00 11 01                    **EXHIBIT B**

MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT POLICY DECLARATIONS

Nicholas M. Brown Jr.
President

Theresa M. Morgan
Secretary

**XL Specialty Insurance Company**

Nicholas M. Brown, Jr.
President

Theresa M. Morgan
Secretary

**Greenwich Insurance Company**

DO 72 35 11 01

Endorsement No. 1
Named Insured: CTC Communications Group, Inc.
Policy No: ELU 82780-02

Effective: October 19, 2002
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# MASSACHUSETTS AMENDATORY ENDORSEMENT

Section VI., GENERAL CONDITIONS (E) CANCELLATION AND RENEWAL OF COVERAGE (2) is deleted and amended to read in its entirety as follows:

(2)    The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than ten (10) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation shall be delivered to the **Parent Company**, or be left at its last address as shown on the Insurer's records or, if its records contain no such address, at its last address known to the Insurer, or be mailed to the address of the **Parent Company** by first class mail, postage prepaid. No written notice of cancellation shall be deemed effective when mailed by the Insurer unless the Insurer obtains a certificate of mailing receipt from the U.S. Postal Service showing the name and address of the **Parent Company** as stated in the Policy. The affidavit of any officer, agent or employee of the Insurer, duly authorized for that purpose, that such notice has been served shall be prima facie evidence that cancellation has been duly effected. If the Policy is made payable to a mortgagee or any person other than the **Parent Company**, notice must also be given to the mortgagee or other person in the manner provided above.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

DO 83 59 09 02

**Endorsement No. 2**
**Named Insured: CTC Communications Group, Inc.**
**Policy No: ELU 82780-02**

**Effective: October 19, 2002**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# PRIOR ACTS EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any act, error, omission, misstatement, misleading statement, neglect, breach of duty, Wrongful Act, Company Wrongful Act or Employment Wrongful Act committed or allegedly committed prior to October 19, 2002.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

DO 83 59 09 02

DO 80 176 06 02

Endorsement No. 3
Named Insured: CTC Communications Group, Inc.
Policy No: ELU 82780-02

Effective: October 19, 2002
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND DEFINITION OF SECURITIES CLAIM ENDORSEMENT

In consideration of the premium charged, Section II Definitions (Q) of the Policy is amended to read in its entirety as follows:

"(Q)    'Securities Claim' means a Claim, other than an administrative or regulatory proceeding against or investigation of a Company, made against any Insured for:

(1)    a violation of any federal, state, local regulation, statute or rule regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities which is:

(a)    brought by any person or entity based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the purchase or sale of, or offer to purchase or sell, securities of the Company; or

(b)    brought by a security holder of a Company with respect to such security holder's interest in securities of such Company; or

(2)    brought derivatively on behalf of the Company by a security holder of such Company.

Notwithstanding the foregoing, the term 'Securities Claim' shall include an administrative or regulatory proceeding against a Company, but only if and only during the time that such proceeding is also commenced and continuously maintained against an Insured Person."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

James Koval
Print Name

Sr. Vice President
Title

DO 80 177 06 02

**Endorsement No. 4**
**Named Insured:** CTC Communications Group, Inc.
**Policy No:** ELU 82780-02

**Effective: October 19, 2002**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF LOSS ENDORSEMENT

In consideration of the premium charged, Section II Definitions (M) of the Policy is amended to read in its entirety as follows:

"(M)    'Loss' means adjudicated damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay. Loss will not include:

(1)    the multiplied portion of any damage award;

(2)    fines, penalties or taxes imposed by law;

(3)    taxes or wages; or

(4)    matters which are uninsurable under the law pursuant to which this Policy is construed.

NOTE:  With respect to judgments in which punitive damage are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the Insured, punitive damages are insurable under applicable law, the Insurer will not dispute the written opinion of the counsel for the Insured."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

James Koval
_____
Print Name

Sr. Vice President
_____
Title

DO 80 142 10 01

Endorsement No. 5
Named Insured: CTC Communications Group, Inc.
Policy No: ELU 82780-02

Effective: October 19, 2002
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND SECTION IV ENDORSEMENT

In consideration of the premium charged, Section IV Limit of Liability, Indemnification and Retentions (F) of the Policy is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____James Koval_____
Print Name

_____Sr. Vice President_____
Title

DO 83 27 07 01

Endorsement No. 6
Named Insured: CTC Communications Group, Inc.
Policy No: ELU 82780-02

Effective: October 19, 2002
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance COmpany

# AMEND INSURED V. INSURED EXCLUSION

In consideration of the premium charged, Section III Exclusions (G) of the Policy is amended to read in its entirety as follows:

"(G)    by, on behalf of, or in the name or right of, the Company or any Insured Person, except and to the extent such Claim:

(1)    is brought derivatively by a security holder of the Company who, when such Claim is made and maintained is acting independently of, and without the active solicitation, assistance, participation or intervention of an Insured Person or the Company;

(2)    is brought by the Bankruptcy Trustee or Examiner of the Company or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company;

(3)    any Claim in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an Insured Person which is part of or results directly from a Claim which is not otherwise excluded by the terms of this Policy; or

(4)    is an Employment Practices Claim;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

DO 80 135 08 01

Endorsement No. 7
Named Insured: CTC Communications Group, Inc.
Policy No: ELU 82780-02

Effective: October 19, 2003
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# CONVERT POLICY TO RUN-OFF UPON HAPPENING OF SPECIFIC EVENT

In consideration of the premium charged:

(1)    If, during the Policy Period, the event described in paragraph (2) below occurs:

    (a)    coverage under this Policy will continue in full force and effect with respect to any Claim for a Wrongful Act, Employment Wrongful Act and Company Wrongful Act committed or allegedly committed before such event, but coverage will cease with respect to any Claim for a Wrongful Act, Employment Wrongful Act and Company Wrongful Act committed or allegedly committed on or after such event (hereinafter, the date of such event, "Conversion Date").

    (b)    The Expiration Date set forth in Item 2 of the Declarations shall be amended to that date exactly six (6) years after the Conversion Date.

    (c)    The term "Company" shall not include those Subsidiaries created or acquired after the Conversion Date.

    (d)    Section VI General Conditions (F) of the Policy and Item 5 of the Declarations, and all other references in the Policy to an Optional Extension Period, are deleted in their entirety.

    (e)    Section VI General Conditions (D) is deleted in its entirety.

    (f)    Section VI General Conditions (E)(1) is amended to read as follows:

        "(1)    Except for the nonpayment of premium, as set forth in (E)(2) below, the Parent Company has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice stating when, not later than the Expiration Date set forth in ITEM 2 of the Declarations such cancellation shall be effective."

    (g)    The entire premium for this Policy shall be deemed fully earned and there shall be no premium adjustment in the event of any cancellation of this Policy pursuant to Section VI General Conditions (E) of the Policy.

(2)    The event upon the happening of which coverage under this Policy will cease with respect to continuing Wrongful Acts, Employment Wrongful Acts and Company Wrongful Acts as described in paragraph (1) above, is as follows:

Emergence from Bankruptcy

DO 80 135 08 01

Endorsement No. 7
Named Insured: CTC Communications Group, Inc.
Policy No: ELU 82780-02

Effective: October 19, 2003
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

James Koval
Print Name

Sr. Vice President
Title

DO 80 152 11 01

Endorsement No. 8
Named Insured: CTC Communications Group, Inc.
Policy No: ELU 82780-02

Effective: October 19, 2003
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# CANCELLATION ENDORSEMENT

In consideration of the premium charged, Section VI General Conditions (E)(1) of the Policy is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

DO 80 152 11 01

Page 1 of 1

DO 80 12 04 00

Endorsement No. 9

Named Insured: CTC Communications Group, Inc.

Policy No: ELU 82780-02

Effective: October 19, 2003

12:01 A.M. Standard Time

Insurer: XL Specialty Insurance Company

# FULLY-EARNED PREMIUM ENDORSEMENT

In consideration of the premium charged, the entire premium for this Policy, as set forth in ITEM 8 of the Declarations, shall be deemed to be fully earned as of the Policy Inception Date set forth in ITEM 2 of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

DO 80 14 04 00

Endorsement No. 10

Named Insured: CTC Communications Group, Inc.

Policy No: ELU 82780-02

Effective: October 19, 2003

12:01 A.M. Standard Time

Insurer: XL Specialty Insurance Company

# AMEND POLICY PERIOD ENDORSEMENT

In consideration of an additional premium of $600,000.00 charged:

(1)    Item 2 of the Declarations is amended to read as follows:

Item 2. Policy Period:  From: October 19, 2002      To:  October 19, 2004
At 12:01 AM Standard Time at your Mailing Address Shown Above.

(2)    It is expressly understood and agreed that the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations shall continue to be the maximum aggregate Limit of Liability for the entire Policy Period, as amended above.

(3)    Item 8 of the Declarations is amended to read as follows:

Item 8. Premium:
Taxes, Surcharges or Fees          $0.00
Total Policy Premium               $845,000.00

(4)    The term "Application," as used in this Policy, shall be deemed to include any additional application and any updated or supplemental information relating to the application for this Policy attached to and forming part of this Policy, including any materials submitted therewith, all of which are on file with the Insurer and are a part of the Policy, as if physically attached.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Endorsement No.: 11
Named Insured: CTC Communications Group, Inc.
Policy No.: ELU 82780-02

Effective: December 16, 2003    DO 90 09 03 04
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# CONVERT TO RUN-OFF ENDORSEMENT

In consideration of an additional premium of $0 charged (the "Run-off Premium"):

(1)    The amount of unearned premium for the Original Policy Period, as defined below, is $N/A.

(2)    Item 2 of the Declarations is amended to read in its entirety as follows:

"Item 2. Policy Period:    From:October 19, 2002    To: December 16, 2009
At 12:01 AM Standard Time at your Mailing Address Shown Above"

(3)    It is expressly understood and agreed that the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations shall continue to be the maximum aggregate Limit of Liability for the entire Policy Period, as amended in paragraph (2) above.

(4)    Item 5 of the Declarations is deleted in its entirety.

(5)    Item 8 of the Declarations is amended to read in its entirety as follows:

"Item 8. Premium:
Original Premium            $845,000.00
Run-off Premium             $0.00
Unearned Premium            N/A
Taxes, Surcharges or Fees   $0.00
Total Policy Premium        $845,000.00"

(6)    No coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act, Employment Practices Wrongful Act or Company Wrongful Act committed or allegedly committed on or after December 16, 2003.

(7)    Section VI General Conditions (D)(5) of the Policy is deleted in its entirety.

(8)    Section VI General Conditions (E)(1) of the Policy is amended to read in its entirety as follows:

"(1)    Except for the nonpayment of premium, as set forth in (E)(2) below, the Parent Company has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice stating when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations."

(9)    Section VI General Conditions (F) of the Policy is deleted in its entirety. All other references in the Policy to the Optional Extension Period are deleted.

(10)    The entire premium for this Policy shall as set forth in paragraph (5) above be deemed fully earned as of December 16, 2003.

(11)    Section VI General Conditions (A)(2) of the Policy is deleted in its entirety.

(12)    Solely for the purposes of this endorsement, the term Original Policy Period means the period of time from October 19, 2002 to October 19, 2004.

DO 90 09 03 04

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

James Koval
Print Name

Sr. Vice President
Title

DO 90 09 03 04

# POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM
## INSURANCE COVERAGE

Coverage for acts of terrorism is already included in your current policy. You should know that, effective November 26, 2002, under your existing coverage, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived.  Any premium waiver is only valid for the current Policy Period.

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT OF 2002, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer: XL Specialty Insurance Company
Policy Number: **ELU 82780-02**

# MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT INSURANCE COVERAGE FORM

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to **Executive Liability Underwriters**, the Underwriting Manager for the Insurer identified in the Declarations (hereinafter the Insurer) including the Application and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the **Insured Persons** and the **Company** agree as follows:

## I.    INSURING AGREEMENTS

(A)    The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act**, except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)    The Insurer shall pay on behalf of the **Company Loss** which the **Company** is required or permitted to pay as indemnification to any of the **Insured Persons** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act**.

(C)    The Insurer shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Company Wrongful Act**.

## II.    DEFINITIONS

(A)    **"Application"** means:

    (1)    the application attached to and forming part of this Policy; and

    (2)    any materials submitted therewith, which shall be retained on file by the Insurer and shall be deemed to be physically attached to this Policy.

(B)    **"Change In Control"** means:

    (1)    the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity;

    (2)    the acquisition by any person, entity or affiliated group of persons or entities of the right to vote, select or appoint more than fifty percent (50%) of the directors of the **Parent Company**; or

    (3)    the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the **Parent Company**.

(C)    **"Claim"** means:

    (1)    a written demand for monetary or non-monetary relief;

    (2)    any civil proceeding in a court of law or equity, or arbitration;

(3)    any criminal proceeding which is commenced by the return of an indictment; and

(4)    a formal civil, criminal, administrative regulatory proceeding or formal investigation of an **Insured Person** or the **Company** (but with respect to the **Company** only for a **Company Wrongful Act**) which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying in writing such **Insured Person** or the **Company** as a person or entity against whom a proceeding as described in (C)(2) or (3) above may be commenced, including any proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body having jurisdiction over any **Employment Practices Wrongful Act.**

(D)    "**Company**" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to GENERAL CONDITIONS VI (D).

(E)    "**Company Wrongful Act**" means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the **Company** in connection with a **Securities Claim.**

(F)    "**Defense Expenses**" means reasonable legal fees and expenses incurred in the defense of any **Claim** including the premium for an appeal bond, attachment bond or similar bond but will not include applying for or furnishing such bond. **Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers or employees.

(G)    "**Employment Practices Wrongful Act**" means any actual or alleged:

(1)    wrongful termination of employment whether actual or constructive;

(2)    employment discrimination of any kind including violation of any federal, state or local law involving employment or discrimination in employment which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee, because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status;

(3)    sexual or other harassment in the workplace; or

(4)    wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, or refusal to hire.

(H)    "**Employment Practices Claim**" means a **Claim** alleging an **Employment Practices Wrongful Act.**

(I)    "**Insured**" means the **Insured Persons** and the **Company.**

(J)    "**Insured Person**" means:

(1)    any past, present or future director or officer, or member of the Board of Managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

(2)    any past, present or future employee of the **Company** to the extent any **Claim** is a **Securities Claim;**

(3)    an individual identified in (J)(1) above who, at the specific written request of the **Company**, is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity;**

(4)    any individual identified in (J)(1) above who, at the specific written request of the **Company** is serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture;** or

DO 71 00 09 99

    (5)    the lawful spouse of any person set forth in the above provisions of this definition, but only to the extent the spouse is a party to any **Claim** solely in their capacity as a spouse of such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and spouse, or property transferred from any such person to the spouse.

In the event of the death, incapacity or bankruptcy of an individual identified in (J)(1), (2), (3), (4) or (5) above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** or **Employment Practices Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

(K)    "**Interrelated Wrongful Acts**" means any **Wrongful Act**, **Company Wrongful Act**, or **Employment Practices Wrongful Act** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events.

(L)    "**Joint Venture**" means any corporation, partnership, joint venture, association or other entity, other than a **Subsidiary**, during any time in which the **Parent Company**, either directly or through one or more **Subsidiary(s)**;

    (1)    owns or controls at least thirty three percent (33%), but not more than fifty percent (50%), in the aggregate of the outstanding securities or other interests representing the right to vote for the election or appointment of those persons of such an entity occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

    (2)    has the right, by contract, ownership of securities or otherwise, to elect, appoint or designate at least thirty three (33%) of those persons described in (L)(1) above.

(M)    "**Loss**" means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and **Defense Expenses** in excess of the Retention that the **Insured** is legally obligated to pay. **Loss** will not include:

    (1)    the multiplied portion of any damage award;

    (2)    fines, penalties or taxes imposed by law; or

    (3)    matters which are uninsurable under the law pursuant to which this Policy is construed.

**NOTE:** With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the **Insured**, punitive damages are insurable under applicable law the Insurer will not dispute the written opinion of counsel for the **Insured**.

(N)    "**Non-Profit Entity**" means a corporation or organization other than the **Company**, which is exempt from taxation under Section 501(c)(3), (4) and (10) of the Internal Revenue Code as amended or any rule or regulation promulgated thereunder.

(O)    "**Parent Company**" means the entity named in ITEM 1 of the Declarations.

(P)    "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

DO 71 00 09 99

(Q)  "**Securities Claim**" means a **Claim** made against an **Insured** for:

(1)  any actual or alleged violation of the Securities Act of 1933 as amended, the Securities Exchange Act of 1934 as amended, any similar federal or state statute or any rules or regulations promulgated thereunder; or

(2)  any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty arising from or in connection with the purchase or sale of, or offer to purchase or sell any securities issued by the **Company**, whether such purchase, sale or offer involves a transaction with the **Company** or occurs in the open market.

(R)  "**Subsidiary**" means any entity during any time in which the **Parent Company** owns, directly or through one or more **Subsidiary(s)**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

(S)  "**Wrongful Act**" means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by any **Insured Person** while acting in his or her capacity as an:

(1)  **Insured Person** of the **Company** or a person serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary**;

(2)  **Insured Person** of the **Company** who at the specific written request of the **Company** is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**; or

(3)  **Insured Person** of the **Company**, who at the specific written request of the **Company** is serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**.

## III.  EXCLUSIONS

The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured Person**, or with respect to INSURING AGREEMENT (C), the **Company**:

(A)  for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this EXCLUSION (A) will not apply to any allegations of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of an **Employment Practices Claim** for an **Employment Practices Wrongful Act**;

(B)  for any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste. With respect to a **Claim** made under INSURING AGREEMENT (A) only, this EXCLUSION (B) will not apply to a **Claim** unless a court of competent jurisdiction specifically determines the **Company** is not permitted to indemnify the **Insured Person**;

**NOTE:**  EXCLUSIONS (A) and (B) above will not apply with respect to a **Securities Claim** brought by a security holder of the **Company**, or a derivative action brought by or on behalf of, or in the name or right of, the **Company**, and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, an **Insured**.

(C)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation;

(D)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to the Pending and Prior Litigation Date set forth in **ITEM 6** of the Declarations;

(E)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

(F)    brought about or contributed to in fact by any:

    (1)    intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

    (2)    profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

    as determined by a final adjudication in the underlying action or in a separate action or proceeding;

(G)    by, on behalf of, or at the direction of the **Company**, except and to the extent such **Claim:**

    (1)    is brought derivatively by a security holder of the **Company** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of an **Insured Person** or the **Company**; or

    (2)    is brought by the Bankruptcy Trustee or Examiner of the **Company** or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company;**

(H)    by, on behalf of, at the direction of or in the name or right of any **Non-Profit Entity** or **Joint Venture** against an **Insured Person** for a **Wrongful Act** or **Employment Practices Wrongful Act** while acting in his or her capacity as a director, officer, trustee, regent or governor of such, or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated; or

(I)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an **Insured Person** acting in their capacity as a **Insured Person** of any entity other than the **Company, Non-Profit Entity** or **Joint Venture.**

No conduct of any **Insured Person** will be imputed to any other **Insured** to determine the application of any of the above EXCLUSIONS.

## IV.    LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS

(A)    The Insurer shall pay the amount of **Loss** in excess of the applicable Retention(s) set forth in **ITEM 4** of the Declarations up to the Limit of Liability set forth in **ITEM 3** of the Declarations.

(B)    The amount set forth in **ITEM 3** of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy. Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(C) With respect to the Company's indemnification of its **Insured Persons**, the certificate of incorporation, charter, by-laws, articles of association, or other organizational documents of the **Parent Company**, each **Subsidiary** and each **Non-Profit Entity** or **Joint Venture**, will be deemed to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

(D) The Retention applicable to INSURING AGREEMENT (B) shall apply to any **Loss** as to which indemnification by the **Company, Non-Profit Entity** or **Joint Venture** is legally permissible, whether or not actual indemnification is made unless such indemnification is not made by the **Company, Non-Profit Entity** or **Joint Venture** solely by reason of its financial insolvency. In the event of financial insolvency, the Retention(s) applicable to INSURING AGREEMENT (A) shall apply.

(E) If different retentions are applicable to different parts of any **Loss**, the applicable Retention(s) will be applied separately to each part of such **Loss**, and the sum of such Retention(s) will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

(F) Notwithstanding the foregoing, solely with respect to a **Securities Claim**, no Retention shall apply to such **Claim** and the Insurer will reimburse those **Defense Expenses** incurred by the **Insured** if:

    (1) the **Securities Claim** is dismissed, or there is a stipulation to dismiss the **Securities Claim**, with or without prejudice and without the payment of any monetary consideration by the **Insured**;

    (2) there is a final judgment of no liability obtained prior to or during trial, in favor of the **Insured**, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or

    (3) there is a final judgment of no liability obtained after trial, in favor of the **Insured**, after the exhaustion of all appeals.

Any reimbursement in the case of (F)(1), (2), or (3) above will only occur if ninety (90) days after the date of dismissal, stipulation, final judgment of no liability is obtained and only if:

    (a) the same **Securities Claim** (or a **Securities Claim** containing **Interrelated Wrongful Acts**) is not brought again within that time; and

    (b) the **Insured** provides the Insurer with an Undertaking in a form acceptable to the Insurer that such reimbursement of the applicable Retention(s) will be paid back to the Insurer in the event the **Securities Claim** (or a **Securities Claim** containing **Interrelated Wrongful Acts**) is brought after the ninety (90) day period.

## V.   DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS

(A) It shall be the duty of the **Insured** and not the duty of the Insurer to defend any **Claim** under this Policy.

(B) No **Insured** may incur any **Defense Expenses** or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably withheld.

(C) Upon the written request of an **Insured**, the Insurer will advance **Defense Expenses** on a current basis in excess of the applicable Retention, if any, before the disposition of the **Claim** for which this policy provides coverage. As a condition of the advancement of **Defense Expenses**, the Insurer may require a written undertaking, in a form satisfactory to the Insurer, which will guarantee the repayment of any **Loss** including **Defense Expenses** paid to or on behalf of the **Insured** if it is finally determined that the **Loss** incurred is not covered under this Policy.

(D) If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insured** contains both covered and uncovered matters, or because a **Claim** is made against both the **Insured** and others (including the **Company** for **Claims** other than **Securities Claims**) not insured

under this Policy, the Insured and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of Loss that is covered under this Policy and that portion of Loss that is not covered under this Policy. Additionally, the Insured and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by, the **Insured** and others.

(E)     In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in (D) above, then the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.   GENERAL CONDITIONS

### (A)   NOTICE

(1)     As a condition precedent to any right to payment under this Policy with respect to any **Claim**, the **Insured** shall give written notice to the Insurer of any **Claim** as soon as practicable after it is first made.

(2)     If, during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** and if, during the **Policy Period**, the **Insured**:

(a)     provides the Insurer with written notice of the specific **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, the circumstances by which the **Insured** first became aware of such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**; and

(b)     requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**;

then any **Claim** subsequently made arising out of such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** will be treated as if it had been first made during the **Policy Period**.

(3)     All notices under GENERAL CONDITIONS (A)(1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 7 of the Declarations; Attention: Claim Department.

### (B)   INTERRELATED CLAIMS

All **Claims** arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the time at which the earliest such **Claim** is made or deemed to have been made pursuant to GENERAL CONDITIONS (A)(1) above or GENERAL CONDITIONS (A)(2), if applicable.

### (C)   OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES

(1)     All **Loss** payable under this Policy will be specifically excess of and will not contribute with any other insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy. This Policy will not be subject to the terms of any other insurance policy.

(2)    All coverage under this Policy for **Loss** from **Claims** made against the **Insured Persons** while acting in their capacity as a director, officer, trustee, regent or governor of a **Non-Profit Entity** or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the **Insured Persons** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture** will be specifically excess of and will not contribute with, any other insurance or indemnification available to such **Insured Person** from such **Non-Profit Entity** or **Joint Venture** by reason of their service as such.

## (D)    MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)

(1)    If during the **Policy Period**, the **Company** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage shall be provided for any **Loss** involving a **Claim** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** occurring after the consummation of the transaction.

(2)    If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the entity, assets, **Subsidiary** or liabilities so acquired or so assumed, exceed thirty five percent (35%) of the total assets or liabilities of the **Company**, as represented in the **Company's** most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days for any **Loss** involving a **Claim** for a **Wrongful Act**, **Company Wrongful Act**, or **Employment Practices Wrongful Act** that occurred after the transaction has been consummated. Coverage beyond the ninety (90) day period will be provided only if:

(a)    the Insurer receives written notice containing full details of the transaction(s); and

(b)    the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

(3)    With respect to the acquisition, assumption, merger, consolidation or otherwise of any entity, asset, **Subsidiary** or liability as described in (D)(1) and (2) above, there will be no coverage available under this Policy for **Claims** made against the acquired, assumed, merged, or consolidated entity, asset, **Subsidiary**, liability, or **Insured Person** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** committed any time during which such entity, asset, liability or **Subsidiary** is not an **Insured**.

(4)    If during the **Policy Period** any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who, because of their service with such **Subsidiary**, were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

(5)    If, during the **Policy Period**, there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** against an **Insured** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** committed or allegedly committed up to the time of the **Change In Control**; and

(a)    coverage will cease with respect to any **Claim** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** committed subsequent to the **Change In Control**; and

(b)    the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control**.

under this Policy, the Insured and the Insurer will use their best efforts to determine a fair and appropriate allocation of Loss between that portion of Loss that is covered under this Policy and that portion of Loss that is not covered under this Policy. Additionally, the Insured and the Insurer agree that in determining a fair and appropriate allocation of Loss, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the Claim by, the Insured and others.

(E)   In the event that an agreement cannot be reached between the Insurer and the Insured as to an allocation of Loss, as described in (D) above, then the Insurer shall advance that portion of Loss which the Insured and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.   GENERAL CONDITIONS

### (A)   NOTICE

(1)   As a condition precedent to any right to payment under this Policy with respect to any Claim, the Insured shall give written notice to the Insurer of any Claim as soon as practicable after it is first made.

(2)   If, during the Policy Period, the Insured first becomes aware of a specific Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act and if, during the Policy Period, the Insured:

(a)   provides the Insurer with written notice of the specific Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, the circumstances by which the Insured first became aware of such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act; and

(b)   requests coverage under this Policy for any subsequently resulting Claim for such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act;

then any Claim subsequently made arising out of such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act will be treated as if it had been first made during the Policy Period.

(3)   All notices under GENERAL CONDITIONS (A)(1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 7 of the Declarations; Attention: Claim Department.

### (B)   INTERRELATED CLAIMS

All Claims arising from the same Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest of the time at which the earliest such Claim is made or deemed to have been made pursuant to GENERAL CONDITIONS (A)(1) above or GENERAL CONDITIONS (A)(2), if applicable.

### (C)   OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES

(1)   All Loss payable under this Policy will be specifically excess of and will not contribute with any other insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy. This Policy will not be subject to the terms of any other insurance policy.

**(H)    EXHAUSTION**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss**, the premium as set forth in ITEM 8 of the Declarations will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

**(I)    REPRESENTATION CLAUSE**

The **Insured** represents that the statements and particulars contained in the **Application** as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are material to the risk assumed and form the basis of this Policy. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person(s) who signed the **Application**. In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

**(J)    ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

(1)    No action may be taken against the Insurer unless, as a condition precedent thereto:

    (a)    there has been full compliance with all of the terms and conditions of this Policy; and

    (b)    the amount of the obligation of the **Insured** has been finally determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured**, the claimant and the Insurer.

(2)    Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the Insurer to determine their liability, nor may the **Insured** implead the Insurer in any **Claim**.

(3)    Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

(4)    Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations may only be waived or changed by written endorsement.

**(K)    AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect to:

(1)    the payment of the premiums;

(2)    the receiving of any return premiums that may become due under this Policy;

(3)    the giving of all notices to the Insurer as provided herein; and

(4)    the receiving of all notices from the Insurer.

MANAGEMENT LIABILITY
DO 71 00 09 99

(L)     ENTIRE AGREEMENT

The insured agrees that the Declarations, Policy, including the endorsements, attachments and the **Application shall** constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.



**BLAIS**
*Excess & Surplus*
*Agency of Texas. Inc.*

October 26, 2003

Mr. Bob Dunn
Executive Liability Underwriters
One Constitution Plaza, 16th Floor
Hartford, CT 06103

· Re:     **CTC Communications Group, Inc.**
         **Directors and Officers Liability**

Dear Bob:

Enclosed please find the original completed, signed and dated XL application for the above captioned account.

Thanks, and if you have any questions, do not hesitate to call.

Sincerely,

Scott Stortzum
Blais Excess & Surplus Agency of Texas, Inc. - Houston

**Houston**
Two Memorial City Plaza
820 Gessner, Suite 1750
Houston, TX 77024
Ph: (713) 780-7787
Fx: (713) 780-3533

**Dallas**
4570 Westgrove
Suite 245
Addison, TX 75001
Ph: (972) 818-4090
Fx: (972) 818-4088

**Austin**
P.O. Box 92824
Austin, TX 78709-2824
Ph: (512) 894-3460
Fx: (512) 858-1266

# EXECUTIVE LIABILITY UNDERWRITERS

## RENEWAL APPLICATION FOR MANAGEMENT LIABILITY INSURANCE INCLUDING COMPANY REIMBURSEMENT

NOTICE: THE POLICY FOR WHICH THIS RENEWAL APPLICATION IS MADE APPLIES, SUBJECT TO ITS TERMS, ONLY TO "CLAIMS" FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED BY "DEFENSE EXPENSES," AND "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION. THE INSURER WILL HAVE NO DUTY UNDER THE POLICY TO DEFEND ANY "CLAIM." THE ENTIRE APPLICATION SHOULD BE CAREFULLY READ BEFORE IT IS EXECUTED.

1.
 a) Name of Applicant: _CTC COMMUNICATIONS GROUP, INC. AND SUBSIDIARIES_
 (Whenever used in this Application, the term "Applicant" shall mean the Parent Company)

 b) Principal Address: _220 BEAR HILL ROAD_

 City: _WALTHAM_  State: _MA_  Zip Code: _02451_

 c) Name and title of the officer of the **Applicant** designated as the representative to receive all notices from the Insurer on behalf of all person(s) and entity(s) proposed for this Insurance:
 _JOHN D. PITTENGER    EVP FINANCE_

2. Has the Applicant or any Subsidiary in the past twelve (12) months completed or agreed to, or does it contemplate within the next (12) months, any of the following, whether or not such transaction was or will be completed? If "Yes," please describe the significant provisions of the transaction(s) as an attachment to this Application.    _SEE ATTACHMENT_

 a) Sale, distribution or divestiture of any assets or stock other than in the ordinary course of business in an amount exceeding 25% of the Applicant's consolidated assets?    ☒ Yes  ☐ No

 b) Any registration for a public or private placement of securities?    ☐ Yes  ☒ No

 c) Merger, acquisition or consolidation with another entity whose consolidated assets exceed 25% of the Applicant's consolidated assets?    ☐ Yes  ☒ No

 d) Reorganization or arrangement with creditors under federal or state law?    ☒ Yes  ☐ No

3. Have the outside auditors stated there are no material weaknesses in the **Applicant's** system of internal controls?
 If "No", please provide the latest CPA letter to management and management's response    ☐ Yes  ☐ No    _SEE ENCLOSED LETTER IS FEB 02_

4. As part of this Application, please submit the following documents with respect to the Applicant:    _SEE ATTACHMENT_

 a) Latest 10-Q report filed and any 8-K or 13D reports filed with the SEC within the last 12 months.

 b) Each prospectus, offering circular or private placement memorandum within the last 12 months.

 c) Last proxy statement, 10-K and annual report, including audited financial statements with all notes and schedules.

 d) If amended since last submitted, copies of all provisions of the Applicant's charter and bylaws relating to the indemnification of its directors and officers.

5. As part of this Application, please submit a schedule of all material litigation or administrative proceedings with a brief description of each case or proceeding commenced.    _SEE ATTACHMENT_

THE UNDERSIGNED AUTHORIZED AGENT OF THE PERSON(S) AND ENTITY(S) PROPOSED FOR THIS INSURANCE, FOR THE PURPOSE OF THIS RENEWAL APPLICATION, DECLARE THAT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, AFTER REASONABLE INQUIRY, THE STATEMENTS HEREIN ARE TRUE AND COMPLETE. THE INSURER IS AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION. SIGNING THIS RENEWAL APPLICATION DOES NOT BIND THE INSURER TO COMPLETE THE INSURANCE. IT IS AGREED AND UNDERSTOOD THAT THIS RENEWAL APPLICATION SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND WILL BE ATTACHED THERETO.

SUBMISSION OF THIS RENEWAL APPLICATION DOES NOT BIND THE INSURER TO ISSUE ANY COVERAGE; HOWEVER, IT IS AGREED THAT THIS RENEWAL APPLICATION AND ANY MATERIALS SUBMITTED HEREWITH, TOGETHER WITH ALL APPLICATIONS FOR ANY POLICIES ISSUED BY THE INSURER FOR WHICH THIS POLICY IS INTENDED TO BE A RENEWAL OR REPLACEMENT, ARE THE BASIS FOR ISSUANCE OF ANY POLICY WHICH MAY BE ISSUED TO THE APPLICANT BY THE INSURER PURSUANT TO THIS RENEWAL APPLICATION.

DO 95 01 09 99

# EXECUTIVE LIABILITY UNDERWRITERS

IT IS AGREED THAT IN THE EVENT THERE IS ANY MATERIAL CHANGE IN THE ANSWERS TO THE QUESTIONS CONTAINED HEREIN BETWEEN THE DATE OF THIS RENEWAL APPLICATION AND THE POLICY AND THE POLICY EFFECTIVE DATE, THE APPLICANT WILL NOTIFY THE INSURER AND, AT THE SOLE DISCRETION OF THE INSURER, ANY OUTSTANDING QUOTATIONS MAY BE MODIFIED OR WITHDRAWN.

THE UNDERSIGNED DECLARES THAT THE PERSON(S) AND ENTITY(S) PROPOSED FOR THIS INSURANCE UNDERSTAND:

(A)     THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE COMPLETELY EXHAUSTED BY THE PAYMENT OF "DEFENSE EXPENSES," AND IN SUCH EVENT, THE INSURER WILL NOT BE RESPONSIBLE FOR ANY ONGOING DEFENSE EXPENSES OR FOR THE AMOUNT OF ANY JUDGEMENT OR SETTLEMENT TO THE EXTENT THAT ANY OF THE FOREGOING EXCEED ANY APPLICABLE LIMIT OF LIABILITY;

(B)     "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION;

(C)     THIS POLICY APPLIES ONLY TO "CLAIMS" FIRST MADE OR DEEMED MADE DURING THE "POLICY PERIOD," OR, IF PURCHASED, ANY EXTENDED REPORTING PERIOD;

(D)     THE INSURER HAS NO DUTY UNDER THIS POLICY TO DEFEND ANY "CLAIM."

IF THE INFORMATION IN THIS APPLICATION MATERIALLY CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE POLICY EFFECTIVE DATE, THE APPLICANT WILL NOTIFY THE INSURER WHO MAY MODIFY OR WITHDRAW ANY QUOTATION.

THE INFORMATION CONTAINED AND SUBMITTED WITH THIS APPLICATION IS ON FILE WITH THE INSURER AND, ALONG WITH THE APPLICATION, IS CONSIDERED TO BE PHYSICALLY ATTACHED TO THE POLICY AND WILL BECOME PART OF THE POLICY IF ISSUED.

NOTICE TO COLORADO APPLICANTS: IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

NOTICE TO FLORIDA APPLICANTS: ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY EMPLOYER OR EMPLOYEE, INSURANCE COMPANY, OR SELF-INSURED PROGRAM, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE OR MISLEADING INFORMATION IS GUILTY OF A THIRD DEGREE FELONY.

NOTICE TO KENTUCKY APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES ANY APPLICATION FOR INSURANCE CONTAINING ANY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

NOTICE TO MINNESOTA, OHIO AND ARKANSAS APPLICANTS: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD, WHICH IS A CRIME.

NOTICE TO NEW JERSEY APPLICANTS: ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION. NO COVERAGE EXISTS FOR CLAIMS FIRST MADE AFTER THE END OF THE POLICY PERIOD UNLESS, AND TO THE EXTENT, THE EXTENDED REPORTING PERIOD APPLIES. UPON TERMINATION OF COVERAGE FOR ANY REASON, A 60-DAY AUTOMATIC EXTENDED REPORTING PERIOD WILL APPLY. FOR AN ADDITIONAL PREMIUM CALCULATED AS INDICATED IN ITEM 5 OF THE DECLARATION, AN EXTENDED REPORTING PERIOD CAN BE PURCHASED FOR A PERIOD OF AT LEAST ONE YEAR. NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE EXTENDED REPORTING PERIOD WHICH MAY RESULT IN A POTENTIAL COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT SUBSEQUENTLY PROVIDED BY ANOTHER CARRIER. DURING THE FIRST SEVERAL YEARS OF CLAIMS MADE RELATIONSHIPS, CLAIMS MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED CAN EXPECT SUNSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE INCREASES UNTIL THE CLAIMS MADE RELATIONSHIP REACHES MATURITY.

# EXECUTIVE LIABILITY UNDERWRITERS

NOTICE TO OKLAHOMA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

NOTICE TO PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

APPLICANT: CTC COMMUNICATIONS GROUP, INC.

INTERIM CHIEF EXECUTIVE OFFICER    8 OCT 03

EVP FINANCE    8 OCT 03

BY (Signature of Chairman and/or President)    TITLE    DATE

It is agreed and understood that the Application will only be executed by the Chairman and/or President of the Applicant acting in their capacity(s) as the authorized agent of the individual(s) and entity(s) proposed for this insurance.

PRODUCER (Insurance Agent or Broker):    INSURANCE AGENCY OR BROKERAGE:

INSURANCE AGENCY OR BROKERAGE TAXPAYER ID
OR SOCIAL SECURITY NO.:    AGENT OR BROKER LICENSE NO.:

ADDRESS OF AGENT OR BROKER (include Street, City, and Zip Code):

E-MAIL ADDRESS OF AGENT OR BROKER:

SUBMITTED BY (Insurance Agency or Brokerage):

INSURANCE AGENCY OR BROKERAGE TAXPAYER ID
OR SOCIAL SECURITY NO.:    AGENT OR BROKER LICENSE NO.:

ADDRESS OF AGENT OR BROKER (include Street, City, and Zip Code):

DO 95 01 09 99

CTC Communications Group, Inc. and Subsidiaries
Attachment to Application

General

On October 2, 2002, CTC Communications Group, Inc. and CTC
Communications Corp. filed voluntary petitions under Chapter 11 of the U.S.
Bankruptcy Code. On October 9, 2002, CTC Communications Leasing Corp.
and CTC Communications of Virginia, Inc. filed Chapter 11 petitions. CTC has
since operated its business as debtors and debtors-in-possession.

The application has been signed by Michael E. Katzenstein, Interim Chief
Executive Officer, and John D. Pittenger, Executive Vice President – Finance
and Chief Financial Officer.

Question 2(a)

CTC has entered into an investment agreement with Columbia Ventures
Corporation and Columbia Ventures Broadband LLC ("CVC") whereby CVC will
invest $32 million to acquire 100% of the common stock of CTC. The investment
agreement received the approval of the U.S. Bankruptcy Court on August 21,
2003, subject to confirmation of a plan of reorganization.

Question 2(d)

CTC has filed a plan of reorganization and disclosure statement. The plan
implements the CVC investment agreement and provides for the treatment of
CTC's creditors. The plan provides for the cancellation of all prepetition equity
interests.

Question 3

The most recent auditors' internal control letter, dated February 15, 2002, is
attached.

Question 4

CTC's common stock was delisted by NASDAQ. It trades over the counter on
the OTC bulletin board.

By-laws affecting indemnification have not changed since CTC last applied for
directors and officers liability insurance. Enclosed are the relevant sections of
the by-laws of CTC Communications Group, Inc. and its principal operating
subsidiary, CTC Communications Corp.

1

CTC has not made significant securities commission filings since October 3, 2003. Enclosed are forms 8-K for press releases, filed on November 13, 2002, August 7, 2003, August 22, 2003 and September 15, 2003.

Enclosed are the following additional documents:

- Proxy statement, annual meeting of shareholders, May 23, 2002
- Form 10-Q, June 30, 2002
- Form 10-K, December 31, 2001
- Annual Report 2001

Question 5

a) General

CTC desires to make its disclosure of known litigation matters in this application as complete as possible. The disclosure of a litigation matter in this attachment shall not be construed as an admission of the merits of such litigation or that that such matter is material.

b) Ordinary Course Litigation

In the ordinary course of business, CTC is party to the litigation listed below. Items (iv), (v), (vi), and (viii) do not derive from CTC's Chapter 11 cases but from the insolvencies of certain former CTC customers. Except for items (ix), (x) and (xi), these matters arose or are alleged to have arisen prior to the Chapter 11 petition dates.

i) CTC and its Subsidiaries are defendants in adversary proceeding 03-53262 (PJW) (Edna E. Croucher et al v. CTC) alleging liability under the WARN Act

ii) EEOC complaint (EEOC Charge No. 160A300337, October 11, 2002) by Christinne Rudkin

iii) In reply to Company's civil action 03 10244 (REK) in the U.S. District Court of Massachusetts against Schreiber and Associates P.C. and S&A Services of Watertown, Ltd. (an action to collect unpaid accounts by Company), defendants have counter-claimed against Company for breach of contract

iv) Trustee of Randall's Island Family Golf Centers Inc. et al. (case nos. 00-41101 and 00-41103 through 00-41196 (SMB) has filed notice of an action (adversary proceeding 02-02278) to recover $212,436 in payments made to CTC in Randall's Island's preference period

2

v) Trustee of Spaulding Composites, Inc. (case no. 01-10346 (JMD)), USBC District of New Hampshire has filed notice of an action (adversary proceeding 03-1073 (JMD) to recover $17,286 in payments made to CTC in Spaulding's preference period

vi) Liquidating Supervisor of Olympus Health Group, Inc. (case no. 01-1858 (MFW)), USBC District of Delaware has filed notice of an action (adversary proceeding 03-53365) to recover $20,375 in payments made to CTC in Olympus's preference period

vii) Chubb & Son, Inc. has filed action MICV2003-01593 in the Middlesex County, MA Superior Court seeking collection of pre-petition insurance premiums in the amount of $51, 654.37

viii) John Turner, Chapter 7 Trustee for ABP Air Group, Inc. has filed a complaint (USBC, District of Maine) seeking avoidance of alleged preference in the amount of $4,069.74

ix) Michael D. Bedard, Trustee of Tower Square Realty Trust has filed an action for collection of back rent in the MA District Court, Attleboro Division

x) Company has received and is currently assessing ordinary-course customer complaints lodged through regulatory agencies. It has also received and replied to other customer complaints most of which Company considers closed, with or without resolution

xi) CTC is plaintiff in approximately 35 actions to collect amounts owing by customers.

b) <u>Bankruptcy-Related Litigation</u>

CTC is party to numerous motions and actions forming part of its Chapter 11 cases. Certain ordinary-course litigation was also filed by parties in the Bankruptcy Court as a matter of procedure.

c) <u>Litigation for Post-Petition Matters – CTC as Plaintiff</u>

CTC is pursuing litigation against its former Chairman and Chief Executive Officer, Robert Fabbricatore, New Horizons Communications Corp. ("New Horizons") and certain other defendants who are former CTC employees or corporations owned by them (the "Defendants") to enjoin the Defendants from, among other things: (i) misusing confidential information; (ii) breaching the customer non-solicitation obligations contained in employment agreements that Debtors had entered into with certain of the Defendants; (iii) breaching the employee non-solicitation obligations contained in the same employment agreements; and (iv) tortiously interfering with the Debtors' contractual and business relationships, including those with customers, and

the contractual non-solicitation obligations of the Defendants themselves.. Venue of this proceeding was transferred to the United States Bankruptcy Court for the District of Massachusetts (the "Massachusetts Bankruptcy Court").

Although CTC believes that substantially all actions and events giving rise to this litigation occurred prior to the Chapter 11 filings, it is possible that discovery in this action may reveal that some actions and events took place in the 60 days leading up to the date of the Chapter 11 filings.

CTC filed suit on March 6, 2003. On June 3, 2003, the Massachusetts Bankruptcy Court conducted a hearing on CTC's request for injunctive relief, and took the matter under advisement. On June 27, 2003, the Massachusetts Court entered a procedural order finding that with the exception of CTC's claim for violation of the automatic stay, none of the claims contained in CTC's complaint were core matters, and consequently that the Court had no jurisdiction, absent the consent of the parties, to enter the relief sought by CTC. The Court requested that the parties notify it as to whether they would consent to the Court's jurisdiction to enter any order which it might ultimately issue. Although CTC and the Creditors Committee consented, the Defendants did not. Consequently, the Court indicated that it would enter findings of fact and conclusions of law on the docket, and refer this matter to the United States District Court for the District of Massachusetts ("District Court") for entry of the appropriate order.

On July 29, 2003, the Massachusetts Bankruptcy Court issued its Proposed Findings of Fact and Conclusions of Law on Plaintiffs' Motion for Preliminary Injunction ("Proposed Findings"), finding that CTC was entitled to its requested preliminary injunction in part. Specifically, the Massachusetts Bankruptcy Court determined that CTC was entitled to a preliminary injunction that enjoins (i) Defendants Donald Dawson, Philip Fratantonio, Mark Marzullo, and Kevin Nee from violation of their employment agreements with CTC through passive solicitation of the customers of CTC on whose accounts they worked while at CTC, and (ii) Defendants Fabbricatore and New Horizons from intentionally interfering with CTC's employment agreements with sales agents of New Horizons by compensating them for, and not expressly circumscribing, passive solicitation of the same accounts.

The Massachusetts Bankruptcy Court transmitted its Proposed Findings to the District Court on September 8, 2003 where the matter is now pending.

d) <u>Potential Action for Prepetition Matters Against Directors and Officers;
Creditors' Committee Motion</u>

Enclosed are copies of letters sent by CTC to each of its directors and officers liability insurers providing information on potential claims. The letters are incorporated herein by reference.